# FOR PUBLICATION
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant-Cross-Appellee,*

v.

MARK CAPENER,
       *Defendant-Appellee-Cross-*
              *Appellant.*

Nos. 07-10359
07-10372

D.C. No.
3:05-CR-0114-
RCJ-RAM

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
Robert C. Jones, District Judge, Presiding

Argued and Submitted
November 17, 2008—San Francisco, California

Filed January 8, 2010
Amended June 9, 2010

Before: Kim McLane Wardlaw and William C. Canby, Jr.,
Circuit Judges, and David G. Trager,* District Judge.

Opinion by Judge Trager

---

*The Honorable David G. Trager, United States District Court Judge for
the Eastern District of New York, sitting by designation.

## COUNSEL

Vijay Shanker, United States Department of Justice, Washington, DC, for the plaintiff-appellant-cross-appellee.

Jeffery S. Parker, Great Falls, Virginia, for the defendant-appellee-cross-appellant.

## ORDER

The opinion filed in this case on January 8, 2010, and reported at 590 F.3d 1058, is hereby amended. An amended opinion is filed concurrently with this order. With these

amendments, the panel has unanimously voted to deny the petition for rehearing. Judge Wardlaw has voted to deny the petition for rehearing en banc, and Judges Canby and Trager so recommend. The full court has been advised of the petition for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and petition for rehearing en banc are DENIED. No subsequent petitions for rehearing and rehearing en banc may be filed.

---

**OPINION**

TRAGER, District Judge:

This case arises out of the failed prosecution of Dr. Mark Capener for health care fraud in violation of 18 U.S.C. § 1347, mail fraud in violation of 18 U.S.C. § 1341 and making false statements in violation of 18 U.S.C. § 1001. During the period relevant to this case, Dr. Capener was an otorhinolaryngologist in Nevada. The charges against him involved billing for surgeries that were allegedly either unnecessary, never performed or exaggerated for billing purposes ("upcoded"). After an extended investigation and a lengthy trial, the district court dismissed many of the counts against Capener on the ground that they were insufficiently supported by the evidence and the jury acquitted Capener of the remaining counts.

Following the trial, Capener moved for an award of fees to cover his defense costs under the Hyde Amendment, 18 U.S.C. § 3006A note, which allows an award of fees to a defendant when the prosecution acted in a manner that was "vexatious, frivolous, or in bad faith . . . ." *Id.* The district court partially granted Capener's motion, awarding fees to cover the costs of defending against certain counts associated

with one of the theories advanced by the government on the ground that this theory was frivolous.

Both parties appeal the district court's decision. The government argues that the district court erred by granting fees after considering the government's case piecemeal — rather than viewing the case's alleged faults in the context of the case as a whole. The government also argues that, even viewed piecemeal, no part of government's prosecution meets the Hyde Amendment's standards for an award of fees. Capener cross-appeals, arguing that the district court should have granted fees on the entire case. Capener also argues that the district court should have granted him discovery regarding his Hyde Amendment claim. For the reasons stated below, the district court is reversed and Capener's application for fees is denied in its entirety.

## BACKGROUND

## (1)

## Investigation and Pre-Trial Proceedings

The investigation into Capener's medical practice began after Great-West Insurance Company referred him to the Nevada Attorney General, who, in turn, referred him to federal authorities. Great-West had contacted the Attorney General's office after Great-West's investigation of Capener's insurance claims appeared to reveal a pattern of excessive procedures and suspicious claims. In the course of the investigation, the government consulted Dr. John Dooley. Dr. Dooley reviewed some patient records and computed tomography ("CT") scans and indicated to the government that he believed that Capener had billed for unnecessary and unperformed surgeries.[1] Dooley also suggested that the government consult

---

[1]The record is not clear regarding how many patient files Dr. Dooley reviewed. There is also no indication that Dr. Dooley ever disagreed with the government's main expert, Dr. Dale Rice, regarding any of the cases in question.

Dr. Dale Rice. Dr. Rice reviewed Capener's patient files, pathology reports and CT scans and concluded that many of the surgeries that Capener billed for were either unnecessary or were not performed.

Capener was indicted in July 2005. The grand jury charged him with 38 counts of health care fraud in violation of 18 U.S.C. § 1347, 13 counts of mail fraud in violation of 18 U.S.C. § 1341 and one count of making false statements in violation of 18 U.S.C. § 1001. The indictment alleged that the challenged procedures had not been performed, were unnecessary or were upcoded to increase the billing rate.

During the investigative phase, Dr. Rice indicated to the government that part of his conclusions were supported by the fact that no bone fragments had been reported in pathology samples taken from some of Dr. Capener's patients. Pathology samples consist of tissue taken from a patient after surgery. These samples are examined by a pathologist who then prepares a report. The bulk of the pathology reports that Dr. Rice reviewed had been prepared by Dr. George Mardini. Of the set of reports that Dr. Rice reviewed, some did not explicitly note the presence of bone fragments in the pathology sample while others specifically mentioned bone fragments. Dr. Rice concluded that, where bone fragments were present in a pathology sample, Dr. Mardini explicitly listed them in his report. The absence of any indication of fragments in the report therefore seemed to Dr. Rice to indicate that there were no fragments in the sample.

Dr. Rice theorized that, because some of the surgeries that Capener claimed to have performed would require breaking bones, bone fragments should have been present in the pathology samples. Where it appeared that they were not present, Dr. Rice reasoned that the surgery must not have been performed. Dr. Rice never indicated to the prosecutors that he needed further information or clarification regarding the presence or absence of bone fragments in these pathology reports.

Prior to trial, the government produced an expert witness disclosure concerning Dr. Rice's expected testimony. This disclosure described Dr. Rice's conclusion that Capener had billed for unnecessary and unperformed surgeries. It also indicated that Dr. Rice would base his testimony on CT scans and his own experience and judgment. However, the disclosure did not indicate that Dr. Rice would be basing any of his conclusions on the belief that bone fragments were absent from the pathology samples. That said, the prosecution had disclosed the fact that the absence of bone fragments was a central part of their theory in discussions with Capener's prior counsel at an earlier stage of the case.

In fact, most, if not all of the pathology samples in question did contain bone fragments. Dr. Mardini simply had not specifically mentioned this fact in some of the reports. Dr. Mardini and another doctor called by the defense, Dr. Steven Skoumal, explained at trial that bone fragments fall under the more general category of "sinosal mucosa." Dr. Skoumal testified that there was nothing wrong with the fact that Dr. Mardini had not specifically mentioned bone fragments in the pathology samples. The government interviewed Dr. Mardini during its investigation but did not discover that the pathology samples actually did contain bone fragments.[2]

Also, as part of the pretrial proceedings, Capener moved for a subpoena to examine the medical records of the patients mentioned in the indictment. The government opposed his initial motion for subpoenas on the grounds that the proposed subpoenas were procedurally defective under Fed. R. Crim.P. 17, overly broad and non-compliant with protections for patient privacy in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

---

[2]The record is not entirely clear on what questions the prosecution asked Dr. Mardini when it spoke with him. Dr. Mardini was called by the defense at trial and was asked whether the prosecution specifically inquired about the presence of bone fragments in the samples. He stated that he could not recall.

The district court quashed the subpoenas, generally agreeing with the reasons put forth by the government. Later, the defense came forward with a more narrowly drawn request for subpoenas in compliance with HIPPA. The government filed no objection to most of the new, more narrowly drawn subpoenas. A magistrate judge issued subpoenas pursuant to the defense's second request. The material produced in response to these subpoenas indicated that many of the patients Capener had operated on had a history of sinus problems, tending to show that they might have appeared to need surgery.

## (2)

## Trial

In its case-in-chief, the government called Dr. Rice. Dr. Rice testified that, in his expert opinion, Capener had billed for unnecessary or unperformed surgeries. The major bases for his opinion were that (1) Capener's records indicated implausibly short times for the claimed surgeries, (2) some of the CT scans indicated that certain nasal bone structures were intact, which Dr. Rice felt would not have been intact if the claimed surgery had been performed, (3) CT scans indicated that some patients did not have frontal sinuses, as that term is medically defined, making it impossible for Capener to have performed frontal sinus surgery on them as he claimed and (4) under Dr. Rice's interpretation of the pathology reports, no bone fragments were found in some pathology samples. Of the seventeen health care fraud counts that would ultimately reach the jury, eleven did not rely at all on the bone fragments theory. With respect to the six counts where Dr. Rice did rely on the bone fragments theory, Dr. Rice also based his conclusion on one or more other theories as additional justifications.

The government called six significant doctors other than Dr. Rice to substantiate the charges against Capener. These other witnesses, however, collectively testified regarding far

fewer patients than Dr. Rice. Drs. Bud West, David Mathis, Timothy Dyches, Anthony Zamboni and Michael Kaplan offered opinions regarding one patient each. In each case, they indicated that they did not believe that Capener had performed the claimed surgery. Dr. David Bolick testified that one patient's pathology sample lacked a type of tissue that it normally would have had if the claimed surgery had been performed and that he did not receive a pathology sample for another patient even though he normally would have. All told, these doctors testified about a total of seven patients while Dr. Rice testified regarding at least seventeen patients.[3] In addition to these doctors, several of Capener's employees testified that they felt he used fraudulent billing practices. However, the government presented only one witness who had actually observed any surgeries — and that witness claimed to have watched only a couple of them.

In response to the government's contention that there were no bone fragments in some of the relevant pathology samples, the defense called Dr. Mardini, the pathologist who had processed the samples. Dr. Mardini testified that there had been bone fragments in most, if not all of the pathology samples he examined. Another defense pathologist, Dr. Skoumal, explained that bone fragments need not be separately listed on a pathology report as they can fall under the general category of sinonasal mucosa and Dr. Mardini had testified that, when he referred to sinonasal mucosa, he was including bone fragments. In addition, the defense presented pathology slides from patients treated by Capener. On these slides, the bone fragments were plainly visible.

The defense also addressed other elements of the government's case. In response to the contention that some of Capener's surgeries had been unnecessary, the defense presented

---

[3]The figure of seventeen patients includes only those whose surgeries related to counts that were actually sent to the jury rather than being dismissed by the district court.

testimony indicating that aggressive surgical intervention of the sort espoused by Capener was an accepted treatment philosophy and that CT scans of the type relied on by Dr. Rice did not always indicate whether a patient suffered from sinus symptoms. Further, Capener put on testimony supporting his use of the relevant billing codes. The defense also presented a video showing Capener rapidly performing a surgery that the prosecution had indicated should take a long period of time.

In its rebuttal case, the prosecution again called Dr. Rice. Dr. Rice disputed the accuracy of the billing codes that Capener had used in charging insurance companies. Dr. Rice also suggested that the presence of bone fragments did not indicate that Capener had performed exactly the kind of surgeries he had claimed.

Following the close of the evidence, the defense moved to dismiss all the charges against Capener. The district court dismissed all twenty-one health care fraud and mail fraud counts alleging that Capener had performed unnecessary surgery, but sent to the jury the remaining twenty-five counts which alleged health care and mail fraud for unperformed surgeries and perhaps upcoding — although the record is not entirely clear on this point — and false statement. After a single day's deliberation, the jury acquitted Capener on all remaining counts.

## (3)

## Post-Trial Proceedings

Following the verdict, Capener moved for an award of fees under the Hyde Amendment. He argued that the prosecution's entire case was vexatious, frivolous and in bad faith. The government responded that its conduct did not entitle Capener to fees. In particular, the government argued (1) that its bone fragments theory was based on an understandable mistake

given that Dr. Mardini had sometimes separately listed the presence of bone fragments, suggesting that when he did not do so, bone fragments were not present, and (2) that the bone fragments theory was only one of the government's arguments at trial.

The district court held a hearing on the fee motion at which the judge made several pertinent remarks. For one, the district court denied Capener's request for documents from the prosecution, finding that Capener had not raised sufficient suspicion to justify an order to produce documents. Regarding the fee request, the district court stated at the start of the hearing that:

> So far, subject to your arguments, I'm not convinced that the government moves in bad faith . . . . [F]rom the Court's own review of the proceedings, there was every reason to have suspicion and, of course, ultimately to obtain a finding of probable cause that criminal conduct had been engaged in . . . . So you've got an uphill battle . . . .

The court later said that "it certainly is very possible that if this had been a civil lawsuit to recover fraud . . . that the government . . . could well have prevailed . . . ." The court also stated that it could not "fault the government for bringing this case." Further, the district court stated, "I am going to award — I'm considering awarding maybe a quarter of the attorneys fees . . . . [T]hat initial view is based on some very brief statements in the briefs here. It will have to be based on a more careful review of the affidavits with regard to the extent of the injury to the defendant . . . ." At the close of the hearing, the district court indicated that "I'm not presently, as I sit here, inclined to exceed, roughly, a quarter, or a third of the overall fees. So I'll do that with review and we'll award something accordingly, for the reasons I've stated here."

After the hearing, the district court produced a written order making findings of fact and law. The district court found that

Capener was entitled to partial relief under the Hyde Amendment. Specifically, the district court held that "the Government pursued frivolous claims as to the fraud-related counts based on the Government's first [theory] — the lack of bone in the pathology reports . . . ." The district court reasoned that the "Government [either] consciously decided to proffer a theory it knew was false, or it failed to conduct any investigation . . . to confirm whether Dr. Rice's contentions regarding lack of bone fragments was . . . accurate." The district court also noted that the government had not indicated that Dr. Rice would testify regarding the bone fragments theory in its expert disclosure. Nonetheless, the district court found that the government had not acted in bad faith, noting that there was no evidence that Dr. Rice lied on the stand and that there was not sufficient evidence that the government consciously acted with ill will.

Additionally, the district court found that the government had not acted vexatiously with regard to its opposition to Capener's subpoenas for the medical records of his surgical patients or in its decision to follow leads provided by allegedly disgruntled informants. The district court concluded that there was no ill will in either case and that some of the counts had been worthy of being submitted to a jury. Finally, the district court found that Capener's counsel "has not demonstrated that the Court should depart from" the standard $125/hour rate. Accordingly, the district court granted Capener's counsel $279,015.50 in fees and costs.

## STANDARD OF REVIEW

"An award of attorney fees pursuant to the Hyde Amendment is reviewed for an abuse of discretion." *United States v. Sherburne*, 506 F.3d 1187, 1189 (9th Cir. 2007). Discovery orders under the Hyde Amendment are reviewed for abuse of discretion. *United States v. Lindberg*, 220 F.3d 1120, 1126 (9th Cir. 2000). We recently clarified the meaning of the "abuse of discretion" standard of review "in the context of a

trial court's factual findings, as applied to legal rules." *See United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (en banc). We employ a two-step inquiry to determine whether a district court abused its discretion in applying law to facts in a manner that is "essentially factual." *Id.* at 1259, 1261. First, we determine de novo "whether the trial court identified the correct legal rule to apply to the relief requested." *Id.* at 1261-62. If it did, we then evaluate the trial court's application of this legal standard to the facts of the case and may reverse only if its application was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* at 1262 (internal quotation marks omitted).

## DISCUSSION

### (1)

### The Government's Appeal

On appeal, the government argues that the district court erred by considering the alleged flaws in the prosecution's case piecemeal rather than asking whether the case — viewed as a whole — met the Hyde Amendment's standards for an award of fees. Capener responds that the district court did view the alleged shortcomings of the prosecution in the context of the case as a whole and that, even if it had not, it would not have been error to focus only on the allegedly flawed portions of the government's case. In fact, the district court conducted a piecemeal analysis of the government's case. Whether this approach was proper or not is something we need not decide because even if a piecemeal approach is permissible, the district court's conclusion that a portion of the government's case was frivolous lacks support in inferences that may be drawn from the facts in the record. *Cf. Hinkson*, 538 F.3d at 1262.

The Hyde Amendment provides that:

> [T]he court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) . . . may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that *the position of the United States was vexatious, frivolous, or in bad faith*, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided . . . under section 2412 of title 28, United States Code.

18 U.S.C. § 3006A note (emphasis added).[4]

**[1]** Thus, under the Hyde Amendment, a victorious defendant may be able to recover legal fees upon showing that the position of the United States was either vexatious, frivolous or in bad faith. 18 U.S.C. § 3006A note. However, "the burden is on the defendant in the underlying case." *Manchester Farming*, 315 F.3d at 1182. On the other hand, "[t]he elements are disjunctive; thus, the defendant need only prove one of the three elements to recover." *Id.* Regardless of the element a prevailing defendant advances, "the Hyde Amendment [is] targeted at prosecutorial misconduct, not prosecutorial mistake." *United States v. Braunstein*, 281 F.3d 982, 995 (9th Cir. 2002) (quoting *United States v. Gilbert*, 198 F.3d 1283, 1304 (11th Cir. 1999)). Indeed, "mere 'faulty judgment' is not vexatious, frivolous, or in bad faith." *United States v. Tucor Intern., Inc.*, 238 F.3d 1171, 1180 (9th Cir. 2001).

---

[4]This case requires consideration only of the threshold question of whether a claimant receives any fees at all. Although it is unnecessary to decide the issue, it is worth noting that the amount of fees awarded may be subject to different considerations from those discussed here. *Cf. Comm'r, Immigration and Naturalization Serv. v. Jean*, 496 U.S. 154, 160-61 (1990) (discussing the Equal Access to Justice Act "EAJA"); *United States v. Heavrin*, 330 F.3d 723, 730 (6th Cir. 2003) (noting that EAJA cases are informative in interpreting the Hyde Amendment).

**[2]** As noted above, although the district court did not find that the government had acted vexatiously or in bad faith, it did find that the bone fragments theory was frivolous. In doing so, it correctly identified the legal standard for measuring frivolousness. Frivolousness is defined objectively. A " 'frivolous' case is one that is groundless . . . . [A] case is frivolous when the government's position was foreclosed by binding precedent or so obviously wrong as to be frivolous." *Manchester Farming*, 315 F.3d at 1183 (internal quotation marks omitted). However, in applying this legal standard to the facts of the case, the district court abused its discretion.

**[3]** The district court based its frivolousness finding primarily upon the fact that a more thorough investigation by the prosecutors would have revealed that the pathology samples actually did contain bone fragments. As it happened, the government did interview the pathologist, Dr. Mardini, but did not discover that the samples contained bone fragments. This was a regrettable mistake — a clear failure by the prosecution to do its homework. The district court's finding that it was misconduct of the sort that could justify a fee award, however, goes too far.

It is true that, under limited circumstances, a failure by the government to thoroughly investigate a case can constitute frivolousness. *See Braunstein*, 281 F.3d at 996-97. However, a failure to sufficiently investigate generally can rise to the level of frivolousness only when the government had some affirmative reason to know that further investigation was needed. For example, the *Braunstein* court found that the prosecutors acted frivolously when they had substantial information affirmatively calling their theory into question and pointing the way to further evidence but failed to investigate further. *Id.* In our case, by contrast, there is no evidence that the government had any affirmative reason to believe that its bone fragments theory was wrong.

Indeed, the government argues that it relied on Dr. Rice's expert opinion and therefore did not act frivolously with

respect to the bone fragments theory. Because Dr. Rice never indicated any need for further investigation, the government contends, their failure to confirm that the pathology samples did not contain bone fragments does not justify a finding of frivolousness.

[4] Where the government ceases investigation in reliance on the opinion of an expert and that expert has not indicated a need for any further investigation, the government generally has not acted frivolously. Cases from several areas of law indicate that this kind of reliance usually does not fall below minimum professional standards. *See, e.g.*, *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1985) (considering a claim of ineffective assistance of counsel); *Dubois v. U.S. Dep't of Agriculture*, 270 F.3d 77, 83 (1st Cir. 2001) (considering a denial of sanctions). Though there do not appear to be any Hyde Amendment cases on point, the cases cited above still suggest that such reliance is generally not "obviously wrong," as required for a finding of frivolousness. To be sure, *Hendricks* and *Dubois* do not apply particularly demanding tests of attorney competence. They are, however, still relevant to the case at hand. The Hyde Amendment does not require excellence — it targets "prosecutorial misconduct, not prosecutorial mistake." *Braunstein*, 281 F.3d at 995. "[M]ere 'faulty judgment' is not vexatious, frivolous, or in bad faith." *Tucor*, 238 F.3d at 1180. Reliance on an expert may well be faulty judgment in a given instance, but it generally will not constitute misconduct of the sort sanctioned by the Hyde Amendment, absent some affirmative reason for the government to know such reliance is misplaced.

Capener responds first that, as a factual matter, the government was not actually relying on Dr. Rice's expertise but had instead misled him — intentionally or otherwise — as to the contents of the pathology samples. Second, Capener contends that, even if the government had relied on Dr. Rice, that reliance would not automatically prevent liability under the Hyde Amendment. As to his first contention, Capener argues that

Dr. Rice depended on the prosecutors for information to such a degree that he was relying on them rather than the other way around. This issue centers on what the prosecutors told Dr. Rice regarding Dr. Mardini's pathology reports. Dr. Rice's affidavit indicates that the prosecutors told him that Dr. Mardini had "verified the content of his reports."

**[5]** This hardly diminishes the prosecutors' reliance on Dr. Rice's expertise. The fact that the prosecutors told Dr. Rice that Dr. Mardini "verified" his reports could mean one of two things: either that the prosecutor told Dr. Rice that the reports were truthful or that the prosecutors told Dr. Rice how to interpret the reports. In order for Rice to have made his error in reliance on the prosecutors, they would had to have told him how to interpret the reports. Dr. Rice's error was one of interpretation — deciding that the fact that a pathology report did not specifically mention bone fragments meant that no bone fragments were actually present. There is no reason to think that the prosecutors told Dr. Rice how to interpret the pathology reports or that he would have listened to them even if they had. The interpretation of a pathology report is a technical matter not a legal one. Accordingly, there is no basis for claiming that the prosecutors were not acting in reliance on Dr. Rice when they halted their investigation of the bone fragments theory.

**[6]** Moreover, even if there are circumstances under which a prosecutor's reliance on an expert would not shield the government from liability under the Hyde Amendment, this case does not present such a situation. There is nothing else about the facts surrounding the prosecutors' reliance on Dr. Rice that suggests that this reliance was frivolous. Dr. Rice was an expert in his field and did not indicate that he needed any additional information regarding the absence of bone fragments in the pathology samples. Though the government apparently failed to ask the pathologist, Dr. Mardini, about the bone fragments issue, there was no specific indication that it was necessary to do so. Moreover, some of Dr. Mardini's

pathology reports specifically indicated the presence of bone fragments, making it reasonable to infer, as Dr. Rice and the government apparently did, that where a report did not specifically indicate bone fragments, that sample did not contain bone fragments.[5]

The strongest point for Capener on the issue of whether the prosecutors were frivolous with respect to the bone fragments theory is the fact that the district court's finding on this point is entitled to deference. The district court wrote that:

> [E]ither the Government consciously decided to proffer a theory it knew was false, or it failed to conduct any investigation or inquiry to confirm whether Dr. Rice's contentions regarding lack of bone fragments was in fact accurate. In addition, the government failed to produce to Capener expert disclosures from Dr. Rice, who discussed the lack of bone as a basis for his opinion. Taken together, these facts indicate the Government had reason to believe their lack-of-bone theory was without support.

[7] This finding, however, is implausible based on the record in this case. The record simply does not substantiate the assertion that the government knew or had reason to believe that its lack of bone fragments theory was false. As

---

[5]Moreover, during the trial, the prosecution spoke with a pathologist named Dr. Samuel Parks. Dr. Parks indicated that, if some reports specifically mention the presence of bone fragments, it would be normal to assume that reports that do not specifically mention bone fragments indicate that the samples do not contain bone fragments. Dr. Parks also indicated that a report should specifically mention bone fragments when it contains bone fragments. Dr. Parks concluded that it was proper to interpret the reports written by Dr. Mardini that did not specifically mention bone fragments as reflecting the fact that the samples did not contain bone fragments. This buttresses the conclusion that the prosecution did not err in a manner that should subject them to liability under the Hyde Amendment.

explained above, the primary fact cited by the district court in this regard — the government's reliance on Dr. Rice's opinion and attendant failure to question Dr. Mardini pre-trial about the lack of bone fragments theory — was an understandable error that does not support the conclusion that the government pursued an obviously incorrect theory.

The only additional fact cited by the district court in support of its frivolousness conclusion is that the government's pre-trial expert witness disclosure did not specifically indicate that Dr. Rice would base some of his testimony on the absence of bone fragments in the pathology sample. The government, however, told Capener's prior attorney about this basis for Dr. Rice's opinions at an earlier stage of the case. Though the failure to include this information in the expert witness disclosure is regrettable, the fact that defendant's prior counsel was informed of the relevant information in another way indicates that there was no intent to deceive and no reckless disregard for the truth. Because the failure to disclose was not done with a culpable mental state, it cannot be evidence of willful blindness on the part of the prosecutors.

**[8]** Finally, there is no basis in the record for the district court's statement that the government might have consciously advanced a false theory. Indeed, this contention is contradicted by the district court's later finding that the government did not "conspire[ with Dr. Rice] to knowingly present false testimony." Accordingly, the district court's finding that the government's conduct regarding the bone fragments theory was frivolous is unsupported by the record and unsustainable.

**(2)**

**Capener's Cross-Appeal**

**[9]** Turning to Capener's argument that he should have been awarded fees for the entire case, Capener raises several challenges to the government's conduct. First, he claims that

the structure of the government's case was inappropriate. He argues that the prosecutors should not have tried to criminalize a difference in medical opinion regarding what treatments were necessary or structured a prosecution around highly technical medical billing codes. In fact, there was nothing improper about these aspects of the government's case. Capener was not being charged with treating patients on the basis of erroneous medical views — he was being charged with fraud for allegedly performing surgeries that he did not genuinely believe were necessary. The evidence presented by the prosecution to the effect that the surgeries were not actually necessary tended to show that Capener could not have subjectively believed they were necessary given his medical training and experience. Similarly, the government's arguments regarding Capener's use of billing codes were proper. Regardless of how complex the codes are, if Capener willfully upcoded procedures, that could constitute fraud.

[10] Second, Capener argues that the prosecution's conduct during the investigation was actionable under Hyde Amendment. His central argument is that the government must have been attempting to suppress or at least avoid the truth.[6] Capener faults the government for opposing his initial attempt to obtain subpoenas for the medical records of his patients. Capener sought these subpoenas in order to demonstrate that the patients had a history of sinus problems and therefore may have looked like they needed treatment. The district court, however, correctly found that there was nothing wrong with the government's initial opposition. Capener's initial subpoenas were invalid because, among other things, they did not

---

[6]Capener also alleges that this case arose against a background of malicious complaints by individuals who were biased against him — such as doctors who were business competitors of his — and that the government relied partly on disgruntled employees of Capener's as witnesses. Of course, the government must often rely on individuals who may have some agenda. This cannot give rise to Hyde Amendment liability here, however, given that the government recruited witnesses with no personal bias against Capener, such as Dr. Rice.

comply with the privacy protections in HIPAA. There cannot be anything improper with opposing a legally invalid subpoena. Moreover, the government did not oppose the bulk of Capener's second round of subpoenas, which were HIPAA compliant, indicating that the prosecution merely wanted subpoenas that were legally valid.

Also regarding the government's conduct during the investigative phase of the case, Capener insists that the prosecution must have known that his patients had a history of sinus problems and thus that surgery might have appeared necessary. Capener bases this contention on the fact that the case was referred to the government by an insurance company. He presumes that the insurance company had the relevant medical records and that the insurance company would have communicated the relevant facts about the patients' sinus problems to the prosecutors in making the referral. Capener argues that, if the prosecutors had known of these sinus problems, it could suggest that they were attempting to avoid the truth. The presence of prior sinus symptoms could at least arguably tend to show that Capener might have believed that the patients in question needed surgery because they had a history of sinus problems.

However, there is no real evidence that the prosecutors knew that some of Capener's patients had prior sinus problems. Nor is it necessarily true that the fact that the case was referred by an insurance company indicates that the prosecutors would have known of the sinus problems. The insurance company may not have informed the prosecutors of the patients' full medical histories or may not have had all the information itself. Capener argues that, even if the prosecutors did not know of these prior sinus problems, they should have sought the relevant medical records and uncovered this fact for themselves. In an ideal world, perhaps, the prosecutors would have tracked down these records. However, their failure to do so was, at worst, negligence. Mere negligence cannot form the basis of an award under the Hyde Amendment.

*Braunstein*, 281 F.3d at 995; *see also In re 1997 Grand Jury*, 215 F.3d 430, 436 (4th Cir. 2000).

**[11]** Capener also argues that the prosecution acted in bad faith, specifically with regard to Dr. Rice's testimony. As noted above, the district court specifically found that the prosecution did not intentionally proffer false testimony from Dr. Rice. Capener presents no substantial evidence to the contrary. Indeed, there is no basis for claiming that Dr. Rice's testimony was willfully false, rather than erroneous. Capener claims that Dr. Rice implied he had personal knowledge of facts that he actually had gleaned from reports created by other doctors. Whether Dr. Rice implied personal knowledge at trial is debatable, but even if he did, it hardly shows intentional or willful misconduct. Capener also stresses that the prosecution knew Dr. Rice would testify without having actually seen the pathology slides and argues that this shows an element of willful blindness. This is, however, a highly technical area. To rely on medical reports rather than the slides is hardly unreasonable. For the reasons stated above, there was nothing egregious about relying on Dr. Rice.

**[12]** Thus, having found that the government's advancement of the bone fragment theory was not frivolous, we see nothing further in the prosecution's case to suggest that liability was appropriate under the Hyde Amendment. Accordingly, no fee award should have been granted in this case.

### (3)

### Capener's Discovery Motion

Capener further contends that the district court erred by refusing to grant him discovery in support of his motion for fees. Were this the case, a remand might be necessary so that the results of any such discovery would be available in deciding whether to award fees. However, the district court did not

err in refusing to grant discovery on Capener's Hyde Amendment claim.

[13] The Hyde Amendment's tools for developing evidence are extremely limited. As noted above, the Hyde Amendment's procedures are based on the EAJA, which provides that a party's entitlement to fees shall be "determined on the basis of the record . . . which is made in the civil action for which fees and other expenses are sought." 28 U.S.C. § 2412(d)(1)(B). The Eleventh Circuit has remarked that "Congress added this language to ensure that the substantial justification determination will not involve additional evidentiary proceedings or additional discovery of agency files, solely for EAJA purposes." *United States v. Certain Real Estate Property Located at 4880 S.E. Dixie Highway*, 838 F.2d 1558, 1564-65 (11th Cir. 1988) (internal quotation marks omitted).

The Hyde Amendment itself provides little additional scope for investigating the government's conduct. One portion of the Hyde Amendment indicates that "the court, for good cause shown, may receive evidence ex parte and in camera . . . ." 18 U.S.C. § 3006A note. Though this provision does not provide for traditional discovery in so many words, we have previously suggested that it might make some form of evidentiary development possible on a showing of good cause. *United States v. Lindberg*, 220 F.3d 1120, 1126 (9th Cir. 2000).

[14] The exact scope of this provision need not be decided here. The district court found that Capener had failed to show good cause for requiring the government to produce evidence. That finding was not an abuse of discretion. As the district court noted, Capener sought documents primarily to substantiate his claims that the prosecution acted in bad faith — but he failed to present any evidence to the district court supporting his allegations of bad faith on the part of the prosecutors.

Under these circumstances, it was not an abuse of discretion to deny discovery.

## CONCLUSION

[15] For the reasons stated above, the district court's judgment awarding partial fees is reversed, and Capener's cross-appeal seeking full fees is rejected.

No. 07-10359 (main appeal) REVERSED.

No. 07-10372 (cross-appeal) AFFIRMED.