**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1923
_____

UNITED STATES OF AMERICA,
                                        Appellant

v.

MARIO NELSON REYES-ROMERO
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2:17-cr-00292-001)
Hon. Mark R. Hornak, Chief United States District Judge
_____

Argued March 3, 2020

Before: SMITH, *Chief Judge*, HARDIMAN, and KRAUSE,
*Circuit Judges*

(Filed: May 19, 2020)

Donovan J. Cocas    [**Argued**]
Laura S. Irwin
Office of the United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

   *Counsel for Appellant United States of America*

Adrian N. Roe        [**Argued**]
428 Boulevard of the Allies
First Floor
Pittsburgh, PA 15219

   *Counsel for Appellee Mario Nelson Reyes-Romero*

_____

## OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

Under the Hyde Amendment, a prevailing defendant in a federal criminal prosecution can apply to have his attorney's fees and costs covered by the government. Such an award is appropriate only if the defendant shows that "the position of the United States" in the prosecution "was vexatious, frivolous, or in bad faith." Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (codified at 18 U.S.C. § 3006A app.). That standard is demanding, and it requires far-reaching prosecutorial misconduct affecting the criminal case "as an inclusive whole." *United States v. Manzo*, 712 F.3d 805, 810 (3d Cir. 2013). Short of that standard, the Hyde Amendment is not an

2

appropriate vehicle to criticize the conduct of law enforcement officers or second-guess the management of a criminal prosecution.

The District Court here awarded attorney's fees and costs under the Hyde Amendment to Mario Nelson Reyes-Romero, who was prosecuted for unlawful reentry in violation of 8 U.S.C. § 1326, on the grounds that the prosecution was frivolous and in bad faith. Although assuredly born of good intentions and understandable frustration with faulty processes in the underlying removal proceeding here, that award was not based on the type of pervasive prosecutorial misconduct with which the Amendment is concerned. Accordingly, we will reverse.

## I. BACKGROUND

The relevant background can be divided into three stages. First, Reyes-Romero, a noncitizen,[1] was subject to an administrative removal proceeding and removed from the country. Second, he returned to the United States and was prosecuted for unlawful reentry, a charge that he collaterally attacked under 8 U.S.C. § 1326(d) and that the District Court ultimately dismissed. Third, he sought and was awarded attorney's fees and costs under the Hyde Amendment. Because a complete understanding of this history is crucial for analyzing the question presented, we discuss each stage in some detail.

---

[1] We follow the Supreme Court's lead in using the term "noncitizen" to "refer to any person who is not a citizen or national of the United States." *Pereira v. Sessions*, 138 S. Ct. 2105, 2110 n.1 (2018).

3

**A. 2011 Administrative Removal Proceeding**

Reyes-Romero, an El Salvadoran national, entered the United States unlawfully in 2004. In 2008, the Department of Homeland Security (DHS) initiated removal proceedings on the ground that he was "present in the United States without [having] be[en] admitted or paroled," 8 U.S.C. § 1182(a)(6)(A)(i). A year later, after Reyes-Romero pleaded guilty to aggravated assault in New Jersey state court,[2] DHS aborted the § 1182 proceeding and placed him in expedited administrative removal on the ground that his conviction constituted an "aggravated felony," 8 U.S.C. § 1228(b)(1), namely a "crime of violence," *id.* § 1101(a)(43)(F) (incorporating 18 U.S.C. § 16's definition).

In 2011, DHS officers Trushant Darji and Jose Alicea conducted Reyes-Romero's administrative removal proceeding. The officers first served him with a Form I-826, which sets out a "Notice of Rights and Request for Disposition." App. 180. It is unclear why they did so, as the I-826 does not apply to noncitizens in expedited removal because of an aggravated felony conviction. For instance, the I-826 instructed Reyes-Romero he "ha[d] the right to a hearing before the Immigration Court," *id.*, even though administrative removal is conducted

---

[2] The statute under which Reyes-Romero was convicted makes it a second-degree felony to "[a]ttempt[] to cause serious bodily injury to another, or cause[] injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly cause[] such injury." N.J. Stat. Ann. § 2C:12-1(b)(1). He was sentenced to time served (397 days) and three years' supervised release.

4

by immigration officers outside of the Immigration Court, *see* 8 U.S.C. § 1228(a)(3), (b)(1). Adding to the confusion, two boxes on the I-826 corresponding with contradictory declarations were checked, indicating Reyes-Romero had both "request[ed] a hearing before the Immigration Court" to determine his right to remain in the country and had "give[n] up [his] right to a hearing" so he could be returned to El Salvador. App. 180.

The officers then presented Reyes-Romero with the applicable form—a Form I-851, the "Notice of Intent to Issue a Final Administrative Removal Order" that governs noncitizens who are charged with having committed an aggravated felony. App. 96–97. The I-851 informed Reyes-Romero of the grounds for expedited removal, his ability to contest those grounds, and the option to raise any "fear [of] persecution" related to his return to El Salvador. *Id.* That form indicated Reyes-Romero conceded removability, "acknowledge[d] that [he was] not eligible for any form of relief from removal," and waived judicial review. App. 97. But close examination of the I-851 reveals it to be irregular. Reyes-Romero apparently executed the waiver of his rights at 9:00 AM—twenty minutes before the time stamp next to a certification that the form had been translated into Spanish for his benefit and forty minutes before the time stamp accompanying the relevant DHS supervisor's issuing signature.

Reyes-Romero received a final administrative removal order that afternoon and was later removed to El Salvador.

5

### B. Unlawful Reentry Prosecution

Reyes-Romero returned to the United States without inspection and, after he was found and detained, a federal grand jury returned an indictment charging him with unlawful reentry in violation of 8 U.S.C. § 1326. He did not contest any of the elements of that offense—that he had been "removed" and was later "found in" the country without express consent, 8 U.S.C. § 1326(a).

Instead, Reyes-Romero moved to dismiss the indictment under a statutory provision allowing him to "challenge the validity of the [removal] order" on which the prosecution was based, 8 U.S.C. § 1326(d). Under § 1326(d), a defendant bears the burden of showing that (1) he "exhausted any administrative remedies that may have been available to seek relief against the [removal] order"; (2) the removal proceedings "improperly deprived [him] of the opportunity for judicial review"; and (3) the "entry of the [removal] order was fundamentally unfair." *Richardson v. United States*, 558 F.3d 216, 223 (3d Cir. 2009) (quoting 8 U.S.C. § 1326(d)(1)–(3)). "Fundamentally unfair" means "both [(a)] that some fundamental error occurred and [(b)] that as a result of that fundamental error [the defendant] suffered prejudice." *United States v. Charleswell*, 456 F.3d 347, 358 (3d Cir. 2006).

Reyes-Romero's motion advanced two arguments. First, the 2011 administrative removal proceeding, with its contradictory forms and the "inconsisten[t]" selections on the I-826, "had an impermissible tendency to mislead" him and invalidated any waiver of his rights. App. 71. Second, the proceeding was "fundamentally unfair" because he had not committed

6

an aggravated felony and therefore was entitled to a full hearing before an immigration judge (IJ).[3] App. 72.

The Government resisted on both fronts. In its view, Reyes-Romero's I-851 waiver was valid and overcame any inconsistency on the I-826, and as a result he had failed to exhaust administrative remedies or seek judicial review as required by § 1326(d)(1) and (2). And in any event he failed to show prejudice as required by § 1326(d)(3) because he had not demonstrated "a reasonable likelihood that the result"—i.e., the removal order—"would have been different" but for the errors he identified. App. 225 (quoting *Charleswell*, 456 F.3d at 362).

The District Court held a hearing on the § 1326(d) motion. It first addressed the I-851 waiver and its effect on § 1326(d)'s

---

[3] In *Baptiste v. Attorney General*, 841 F.3d 601 (3d Cir. 2016)—a case involving the same offense of which Reyes-Romero was convicted—we held that 18 U.S.C. § 16(b), the "residual" clause of the federal crime-of-violence definition, is void for vagueness. 841 F.3d at 615–21. *Baptiste*'s reasoning was ultimately embraced by the Supreme Court in *Sessions v. Dimaya*, 138 S. Ct. 1204, 1210 (2018). But *Baptiste* avoided the question whether New Jersey second-degree aggravated assault qualifies as a crime of violence under § 16(a), the crime-of-violence definition's "elements" clause. 841 F.3d at 606 n.4. As discussed below, that question turns on whether a state crime capable of commission by reckless conduct can categorically satisfy the elements clause, an issue that remains unresolved. *See Borden v. United States*, 140 S. Ct. 1262 (2020) (granting certiorari on this issue).

exhaustion and judicial-review requirements. The Court expressed concerns not only with the "inconsistent" nature of the I-826 and I-851 forms but also with the I-851's time stamps suggesting Reyes-Romero had been informed of his rights *after* signing the waiver—an argument Reyes-Romero had not developed in his brief. The Court told Adam Hallowell, the Assistant United States Attorney (AUSA) prosecuting the case, that the Government was "in a deep hole" because the immigration forms were "facially at odds with themselves." App. 283.

The Government called Officers Darji and Alicea as witnesses. Each had no memory of Reyes-Romero or his proceeding and had handled a substantial number of immigration cases in the years since 2011, so they testified only to general practices. Darji explained that he often worked with native Spanish speakers like Alicea to serve immigration forms on noncitizens in DHS custody. Noncitizens charged with having committed aggravated felonies would first receive the "more general" I-826 form before receiving the I-851 form "specific to administrative removal." App. 294. The noncitizen would typically "hold the pen" and make necessary selections. App. 291. If the noncitizen made contradictory or nonsensical selections, the officers would confirm his intent but otherwise leave those selections untouched.

The District Court, interposing its own questions at the hearing, pressed Officer Darji about Reyes-Romero's forms:

> THE COURT: . . . [A]m I reading the[se forms] accurately that within moments of 9 o'clock in the morning on June 23rd, 2011, several things had occurred pretty much all at once. This defendant was told he had a right

8

to request a hearing.  He requested a hearing.  He said he didn't want a hearing.  And he was told he couldn't have a hearing.  Am I reading those forms correctly, sir?

THE WITNESS:  Yes.

THE COURT:  Does that make any sense at all to you, sir?

THE WITNESS:  No, Your Honor.

App. 331.  The District Court took Officer Darji's response to mean that "the process that was used" in Reyes-Romero's removal proceeding did not "ma[k]e . . . sense."  App. 476.

Based on that concession and the defects in Reyes-Romero's forms, the District Court made clear it was "highly likely . . . [to] conclude that there was no voluntary and intelligent waiver" and therefore that "the first two prongs of [§ 1326(d)] will have been fulfilled."  App. 474–75.

The parties' attention therefore turned to the "only open issue": prejudice.  App. 543.  At first, Reyes-Romero repeated the argument he had advanced in his brief: that the misidentification of his crime of conviction as an aggravated felony itself constituted prejudice.  But after the District Court pressed him about "the reasonable likelihood of some different result" in the removal proceeding, App. 442, he switched gears, arguing that he could have sought asylum or withholding of removal.  To bolster that novel argument, he offered testimony from relatives who had suffered abuses in El Salvador or in neighboring Honduras.  Seeking more support, Reyes-Romero requested his relatives' A-files, and the parties set out on a multiweek process to get them from DHS.  The Court held Reyes-

9

Romero's motion while that process was underway and requested supplemental briefing to be filed once it was complete.

While his § 1326(d) motion was pending, Reyes-Romero moved for bond. The District Court expressed concern that, were Reyes-Romero to be released, DHS officials would detain him, reinstate the 2011 removal order, and remove him to El Salvador. The Court also wondered aloud whether DHS would take different action if Reyes-Romero were released after the Government had "move[d] to dismiss the indictment," App. 566.

The Government soon came back with a surprise: a motion to dismiss the indictment with prejudice under Federal Rule of Criminal Procedure 48.[4] It explained that based on the evidence at the first hearing "and on additional factual information that ha[d] come to [its] attention" since then, dismissal was "in the interests of justice." App. 603. In another surprise, Reyes-Romero opposed the Government's motion, contending the District Court should grant it only if it also intervened in future immigration proceedings by expressly "barr[ing] [the Government] from removing [him] on the basis of the [2011 removal] [o]rder." App. 608.

When the parties convened for a hearing to address the Government's motion to dismiss, the Government clarified that the "additional . . . information" to which it had referred came from Reyes-Romero's relatives' A-files, some of which "support[ed] the testimony" he had offered in support of relief

---

[4] "The government may, with leave of court, dismiss an indictment . . . ." Fed. R. Crim. P. 48(a).

10

from removal. App. 645. The Government's decision to seek dismissal, it explained, was based on the "litigation risk to th[e] [§ 1326(d)] affirmative defense" and the "time and expense" necessary to continue the prosecution. App. 646. But the District Court was hesitant, asking the Government whether Reyes-Romero risked detention or removal even after dismissal with prejudice, to which the Government replied that it "c[ould] [not] speak for DHS," App. 617. The Court also noted its views that the DHS officers' testimony had been "bizarre" and possibly untruthful, App. 634–35, and that Reyes-Romero's 2011 removal "was not . . . consistent with the highest traditions of the American legal system," App. 657. Still, the Court made clear it was not accusing the prosecution "of any wrongdoing whatsoever," App. 634, and suggested the Government's decision not to proceed with the prosecution was "how we want the system to work," App. 635.

Yet when the hearing resumed the next day, the District Court's assessment had evolved. It now expressed the view that the DHS officers' testimony was not just "bizarre," but a mix of "lies" and "law enforcement outrageousness." App. 677. And it recalled Officer Darji's answer to its line of questioning to have meant not just that "the process . . . used" in the removal proceeding did not "ma[k]e any sense," App. 476, but that "*his* [*own*] *testimony* made no sense," App. 678 (emphasis added). Most significant, the Court no longer deemed AUSA Hallowell blameless, but as needing to make a "choice" about whether he would "continue to rely on th[e] [officers'] testimony." App. 678–79. Even if the prosecution was not responsible for errors in the removal proceeding, it said, there "come[s] a point where" the Government

11

"adopt[s]" those errors as its own. App. 679. The Court again held all motions open pending further briefing.

In an effort to respond to the concerns voiced by the District Court, the Government filed a supplemental brief raising two points: First, the District Court lacked jurisdiction to condition a Rule 48 dismissal on the actions of an independent department—here, on DHS's forgoing future removal proceedings based on the 2011 order. Second, the Government made unambiguous that it was not "rely[ing] on or adopt[ing]" the DHS officers' testimony and was no longer contesting any element of the § 1326(d) defense "other than the issue of prejudice." App. 755.

But the Government's brief came with yet another surprise. At the start of the prosecution, the U.S. Attorney's Office had received black-and-white copies of Reyes-Romero's A-file from DHS and had shared those files with Reyes-Romero's counsel. Neither counsel had previously asked to inspect the originals. But before filing its supplemental brief, the prosecution obtained the original documents, which revealed that the two inconsistent checks on the I-826—one requesting a hearing, the other waiving it—were made in different colors. And based on the ink color, it appeared the DHS officer who signed the form had filled in the box corresponding to Reyes-Romero's waiver of rights. Even more odd, the waiver box featured a blue mark drawn over a pre-printed black "x," suggesting the DHS officers had given Reyes-Romero a pre-filled form. AUSA Hallowell immediately disclosed the color versions of the documents to Reyes-Romero's counsel and to the Court.

12

After reviewing the color copies, the District Court was "more convinced than ever" that the DHS officers' testimony was a "combination of nonsense . . . [and] lies." App. 792. And it continued to criticize the prosecution. The Court took issue, for instance, with AUSA Hallowell's repeated statements that, as an AUSA assigned to a criminal prosecution, he could not unilaterally bind DHS to a specific course of conduct in future immigration proceedings. It also criticized the Government for not adequately "disclaim[ing]" the DHS officers' testimony:

> MR. HALLOWELL: Your Honor, we are saying that we will not rely on that testimony moving forward in this case.
>
> THE COURT: Why? Why won't you rely on it?
>
> MR. HALLOWELL: Your Honor, we don't feel that that testimony can support a verdict for the Government on the first two prongs of [§ 1326(d)].
>
> THE COURT: If believed, it's legally insufficient? Or I shouldn't believe it?
>
> MR. HALLOWELL: We understand that Your Honor will make the final decision as to whether that testimony could be believed or not. . . .
>
> THE COURT: Well, I understand that. I'm asking the lawyer for the United States of America, should I believe that testimony?
>
> MR. HALLOWELL: Your Honor, you should give it as much weight as you see fit.

13

App. 795, 797. In the Court's view, AUSA Hallowell's refusal to "take a[] position" on the testimony conflicted with his obligations as a prosecutor. App. 798–99. And the District Court suggested that the Government had moved to dismiss in "bad faith" to ensure DHS officials could use the 2011 order in future immigration proceedings against Reyes-Romero rather than instituting a new removal proceeding through service of a notice to appear (NTA). App. 822–24.

In response, the Government pointed out that months earlier, DHS officials had attempted to do just that, offering Reyes-Romero an NTA that would have led to new proceedings before an IJ rather than reinstatement of the 2011 administrative removal order. But Reyes-Romero had rejected it. He gave two reasons for having done so: a theory that the Government's choice to prosecute him for unlawful reentry precluded it from starting new removal proceedings[5] and a desire to

---

[5] In support, Reyes-Romero cited several district court opinions holding that if a noncitizen is prosecuted for a criminal offense and is granted pretrial release, he cannot be seized by DHS officials under an immigration detainer during the criminal proceeding. *E.g.*, *United States v. Hernandez-Bourdier*, No. 16-cr-222-2, 2017 WL 56033, at *11 (W.D. Pa. Jan. 5, 2017). That line of cases is contrary to what we and our sister circuits have had to say on the matter, *see, e.g.*, *United States v. Soriano Nunez*, 928 F.3d 240, 247–27 (3d Cir. 2019); *United States v. Lett*, 944 F.3d 467, 470–71 (2d Cir. 2019) (collecting decisions and joining the consensus), and in any event, nothing in those cases suggests the decision to bring a § 1326 prosecution forfeits DHS's right to pursue immigration

14

ensure that the District Court would reach the merits of his § 1326(d) motion.

With the District Court's continued deferral of a ruling, the parties filed supplemental briefing on prejudice. Reyes-Romero's supplemental brief expanded the argument that but for the defects in his 2011 removal proceeding, there was "a reasonable likelihood," *Charleswell*, 456 F.3d at 362, that he would have received asylum, withholding of removal, or protection under the Convention Against Torture (CAT). The Government responded that Reyes-Romero was ineligible for asylum because his assault conviction qualified as an aggravated felony; that he was ineligible for withholding of removal because the assault offense was a "particularly serious crime," 8 U.S.C. § 1231(b)(3)(B)(ii); and that he was not reasonably likely to prevail in seeking CAT protection or any other form of relief from removal. In his reply brief, Reyes-Romero unearthed a new argument: dicta from *Charleswell*, an early decision on § 1326(d), suggesting "[t]here may be some cases where the agency's violations of a [noncitizen's] rights [ar]e so flagrant, and the difficulty of proving prejudice so great, that prejudice may be presumed." 456 F.3d at 362 n.17 (citation omitted).

The District Court ultimately granted Reyes-Romero's § 1326(d) motion. It ruled that the I-826 and I-851 forms were "shams" and that any waiver on those forms was invalid; that, "in light of the invalid waivers," any failure to exhaust administrative remedies or seek judicial review as required by

proceedings against the noncitizen after the criminal prosecution ends.

15

§ 1326(d)(1) and (2) must be excused; that the irregularities in Reyes-Romero's removal proceeding constituted fundamental errors; and that those errors caused him prejudice, both because his claims for relief from removal were reasonably likely to succeed and because "the procedural defects were so central . . . that prejudice must be presumed" under footnote 17 of *Charleswell*. The Court therefore granted Reyes-Romero's motion to dismiss "on the merits." App. 1028. Doing so, the Court explained, would "serve[] to limit [Reyes-Romero's] exposure to future" immigration proceedings "reliant on the . . . 2011" order. App. 1031.

Given that disposition, the District Court denied as moot Reyes-Romero's pending motion for bond. But it did not do the same with the Government's pending motion to dismiss. Instead, it took the "unusual" step, App. 1030, of proceeding to analyze the Government's motion on the merits and denying it as "clearly contrary to manifest public interest." *Id.* (quoting *In re Richards*, 213 F.3d 773, 787 (3d Cir. 2000)). The Court found that the Government's subjective motivation for its motion to dismiss was a desire to guarantee that DHS could rely on the 2011 removal order in future immigration proceedings. That motivation, it explained, "taint[ed]" the Government's effort to have the case dismissed. App. 1032–33. Similarly problematic, the Court continued, was the Government's "taking . . . a noncommittal position as to the credibility of" Officers Darji and Alicea, which the Court deemed inconsistent with the Government's duty to correct a witness's statement that is "obvious[ly]" untrue. App. 1037–38 (quoting *United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir. 1974)).

16

The District Court thus dismissed the indictment with prejudice. The Government did not appeal the District Court's rulings on the motions to dismiss or the order of dismissal.[6]

## C. Hyde Amendment Application

Following that dismissal, Reyes-Romero timely applied to the District Court for attorney's fees and costs under the Hyde Amendment.[7] Relying heavily on the findings in the Court's

---

[6] After the dismissal, DHS officers served Reyes-Romero with an NTA, initiating new removal proceedings in Immigration Court. Before the IJ, Reyes-Romero conceded removability but applied for asylum, withholding of removal, CAT relief, and cancellation of removal. The IJ denied his applications and ordered him removed, and the Board of Immigration Appeals (BIA) dismissed his appeal. His petition for review before the Sixth Circuit remains pending. *Reyes-Romero v. Barr*, No. 19-03784 (6th Cir. Aug. 15, 2019).

[7] Hyde Amendment awards are subject to "the procedures and limitations . . . under section 2412 of title 28," 18 U.S.C. § 3006A app., one of which is that the application must be filed "within thirty days of final judgment," 28 U.S.C. § 2412(d)(1)(B). That thirty-day deadline "begins when the government's right to appeal the order has lapsed." *Johnson v. Gonzales*, 416 F.3d 205, 208 (3d Cir. 2005) (citation omitted). Here, the District Court granted Reyes-Romero's motion to dismiss the indictment on July 2, 2018; the Government's window to appeal closed on August 1, 2018, *see* Fed. R. App. P. 4(b)(1)(B); and Reyes-Romero moved for a Hyde Amendment award on August 7, 2018.

opinion resolving the parties' motions to dismiss, Reyes-Romero argued the Government had pursued an "egregious" prosecution that was "vexatious, frivolous, [and] in bad faith." App. 1052–53 (citation omitted).

The District Court awarded Reyes-Romero fees and costs, a decision it reached in five steps: First, because the Government did not appeal the order resolving the motions to dismiss, the Court deemed any "findings and conclusions in that . . . Opinion and Order final." App. 4. Second, the Court determined that in assessing "the position of the United States," 18 U.S.C. § 3006A app., it would consider not only "the litigation position of the [Department of Justice (DOJ)] through th[e] . . . U.S. Attorney's Office" but also "the actions taken (or not taken) by the federal agency upon which the criminal case is based"—that is, DHS, including "the actions of DHS Officers in 2011." App. 26–27. Third, borrowing a phrase used in the indictment, the Court deemed the deficiencies in Reyes-Romero's immigration forms so apparent that it was "frivolous" for the Government to prosecute him on the ground that he "had been previously . . . removed from the United States *pursuant to law*." App. 31 (citation omitted). Fourth, although the Court acknowledged that the Government's arguments on § 1326(d)(3)'s prejudice requirement "did not brush up against any prosecutorial misconduct" and "were largely reasonable and based in law," it reasoned that "this 'good' . . . [does not] sufficiently outweigh[] the 'bad.'" App. 42. Finally, the Court found that the Government's behavior "before and during the criminal prosecution . . . demonstrated conscious wrongdoing," making the prosecution one brought "in bad faith" under the Amendment. App. 28. So the Court ordered the Government to pay Reyes-Romero's costs

18

and attorney's fees, which it later calculated as $73,757.00. This appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291. Despite a circuit conflict over whether an appeal from a Hyde Amendment application is civil or criminal for purposes of Federal Rule of Appellate Procedure 4, *compare, e.g.*, *United States v. Truesdale*, 211 F.3d 898, 902–04 (5th Cir. 2000) (civil), *with, e.g.*, *United States v. Robbins*, 179 F.3d 1268, 1269–70 (10th Cir. 1999) (criminal), we are assured of our jurisdiction and need not decide the issue because Reyes-Romero's notice of appeal was timely filed even under Rule 4(b)'s shorter deadline. *See United States v. True*, 250 F.3d 410, 421 n.8 (6th Cir. 2001) (taking this approach).

We review a Hyde Amendment award for abuse of discretion, *United States v. Manzo*, 712 F.3d 805, 809–10 (3d Cir. 2013), "which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law[,] or an improper application of law to fact," *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 182 n.1 (3d Cir. 2019) (citation omitted).

## III. DISCUSSION

A defendant seeking fees and costs under the Hyde Amendment bears the burden, *United States v. Manzo*, 712 F.3d 805, 810 (3d Cir. 2013), of showing that the "position of the United States was vexatious, frivolous, or in bad faith," Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (codified at 18 U.S.C. § 3006A app.). Those grounds for a cost- and fee-

shifting award were "curtailed significantly" from those in the more permissive Equal Access to Justice Act (EAJA) provision on which the Hyde Amendment was generally modeled. *United States v. Gilbert*, 198 F.3d 1293, 1302–03 (11th Cir. 1999). As a result, a criminal defendant seeking costs and fees under the Hyde Amendment faces a "daunting obstacle." *Manzo*, 712 F.3d at 810 (quoting *United States v. Isaiah*, 434 F.3d 513, 519 (6th Cir. 2006)).

That obstacle is insurmountable here. Although Reyes-Romero attempts to limit our review, contending that the District Court's previous fact-finding is preclusive and that the Government has waived several of its arguments, we conclude those attempts are futile. And once we assess the complete record, we perceive no basis for a Hyde Amendment award. From the inception of the prosecution and throughout the extensive briefing and hearings, the Government had objectively reasonable arguments that Reyes-Romero was not prejudiced by errors in his 2011 removal proceeding and thus could not prevail on his § 1326(d) challenge. The Government's position, therefore, was not frivolous—a high bar requiring that the prosecution be "utterly without foundation in law or fact." *United States v. Monson*, 636 F.3d 435, 440 (8th Cir. 2011) (citation omitted). Nor was the prosecution brought or maintained in bad faith—an equally high bar requiring an objective showing of "dishonest purpose or moral obliquity." *Manzo*, 712 F.3d at 811 (quoting *Gilbert*, 198 F.3d at 1299). Below, we address issue preclusion and waiver before turning to the merits of the Hyde Amendment application.

20

### A. Threshold Issues

Reyes-Romero does not defend the District Court's decision directly. Instead, he advances two arguments that, if accepted, would restrict our review of the bases for that decision. Neither is persuasive.

### 1. Issue preclusion

Reyes-Romero contends that findings and conclusions in the District Court's opinion resolving the parties' motions to dismiss were rendered "final and binding" by the Government's decision to appeal not those rulings but only the award of fees and costs. Appellee's Br. 1. In support, he cites cases involving the doctrine of issue preclusion, which holds that "a prior judgment . . . foreclose[es] successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Herrera v. Wyoming*, 139 S. Ct. 1686, 1697 (2019) (alterations in original) (citation omitted). But issue preclusion does not apply here for three independent reasons.

*First*, as Reyes-Romero recognizes, issue preclusion applies only "in a subsequent action." Appellee's Br. 9 (quoting 1 Restatement (Second) of Judgments § 27 (Am. Law Inst. 1982)); *see United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 316 (3d Cir. 2019) (requiring that the issues be resolved in an "earlier case" (quoting *Allen v. McCurry*, 449 U.S. 90, 95 (1980))); *Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 474 (3d Cir. 1997) (requiring that they be "decided in a previous action"); *see also United States v. Briseno*, 843 F.3d 264, 270 (7th Cir. 2016) (noting that issue preclusion "applies to rulings in different *proceedings*, and not simply different *stages* within the same proceeding"). "Relitigation of

21

issues previously determined in the *same* litigation," on the other hand, "is controlled by principles of the law of the case doctrine rather than [issue preclusion]." *Hull v. Freeman*, 991 F.2d 86, 90 (3d Cir. 1993) (emphasis added).

Reyes-Romero's criminal prosecution and Hyde Amendment application are, at least for these purposes, part of the "same litigation," *Hull*, 991 F.2d at 90. The Amendment authorizes fee-shifting "*in* . . . criminal case[s]," 18 U.S.C. § 3006A app. (emphasis added), and an application must be submitted "within thirty days of final judgment," 28 U.S.C. § 2412(d)(1)(B); *see* 18 U.S.C. § 3006A app. Although the issues involved in deciding a defendant's guilt or innocence and those involved in a Hyde Amendment application are not identical, the latter flow directly from the former. An application for attorney's fees and costs under the Amendment, therefore, is merely a "different stage[] within the same proceeding," *Briseno*, 843 F.3d at 270 (emphasis omitted). So under *Hull*, if the District Court's previous findings are to have binding effect, that effect must flow not from issue preclusion, but from the law-of-the-case doctrine.

That doctrine, however, is of no help to Reyes-Romero because "[a]n appellate court's function *is* to revisit matters decided in the trial court." *Musacchio v. United States*, 136 S. Ct. 709, 716 (2016). As a result, we are "not bound by district court rulings under the law-of-the-case doctrine," *id.*; *see Koppers Co. v. Aetna Cas. & Sur. Co.*, 158 F.3d 170, 173 n.4 (3d Cir. 1998) ("[T]he district court's reference to 'law of the case' cannot bind this Court on appeal."), and we owe no deference—beyond what the clear error standard of review demands—to findings in the District Court's previous opinion.

*Second*, issue preclusion "cannot apply when the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate that issue." *Heart Sol.*, 923 F.3d at 316 (quoting *Allen*, 449 U.S. at 95). Without an "incentive to obtain a full and fair adjudication" of an issue, a party will not be bound by the court's resolution of it. 1 Restatement (Second) of Judgments § 28(5).

Here, however, the Government had no incentive to contest the District Court's findings or appeal its gratuitous denial of the Government's motion to dismiss. By the time the District Court resolved the parties' motions to dismiss, the Government had long disclaimed reliance on the DHS officers' testimony and abandoned any argument on § 1326(d)'s exhaustion or judicial-review prongs. And given that the Government had *agreed* the prosecution should be dismissed, it comes as no surprise that it chose not to appeal the Court's order of dismissal. We cannot impute to the Government an "incentive to . . . adjudicat[e]," 1 Restatement (Second) of Judgments § 28(5), factual findings made en route to a disposition it sought. Nor would it be prudent to do so, as a contrary rule "would force the [Government] to abandon . . . prudential concerns and to appeal every adverse decision in order to avoid foreclosing further review," *United States v. Mendoza*, 464 U.S. 154, 161 (1984), of any issues that might bear on a Hyde Amendment application.

*Third*, issue preclusion applies only where the issue in question was "essential to the prior judgment." *Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*, 342 F.3d 242, 252 (3d Cir. 2003) (citation omitted). That limitation "is rooted in principles of fairness" and "ensures that preclusive effect is not

given to determinations that did not receive close judicial attention . . . or that were unappealable by virtue of being incidental to a decision." *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 250 (3d Cir. 2006) (internal quotation marks and citation omitted). In defining whether an issue was "essential," we ask whether it "was critical to the judgment or merely dicta." *O'Leary v. Liberty Mut. Ins. Co.*, 923 F.2d 1062, 1067 (3d Cir. 1991).

The findings on which Reyes-Romero relies were not "critical to the judgment," *O'Leary*, 923 F.3d at 1067, and thus are not entitled to preclusive effect. The dispositive parts of the District Court's opinion were its determinations that Reyes-Romero had satisfied each of the prongs of § 1326(d), which together entitled him to dismissal of the indictment. But none of those prongs demanded an assessment of prosecutorial motives: Section 1326(d) focuses on exhaustion, judicial review, and fundamental unfairness in relation to underlying removal proceedings, and the Government's motivation in bringing or maintaining a prosecution years later has no bearing on those issues.[8] Nor does the District Court's decision to address and

---

[8] Nor do the findings related to the immigration officers' misconduct in 2011 have preclusive effect because they contributed to the District Court's determination that Reyes-Romero had satisfied § 1326(d)'s exhaustion and judicial-review requirements. That is because, even beyond what we have already explained, issue preclusion applies only where the issue is "the same as that involved in the prior action." *Karns v. Shanahan*, 879 F.3d 504, 514 n.3 (3d Cir. 2018) (citation omitted). Here, however, there is a "lack of total identity," 1 Restatement (Second) of Judgments § 27 cmt. c,

24

deny the Government's motion to dismiss give rise to preclusion. Indeed, once the Court granted Reyes-Romero's § 1326(d) motion on the merits, the Government's own motion to dismiss became moot—a dynamic the District Court recognized with respect to the issue of release on bond—so the Court's ruling on that motion and attendant findings were, in any event, beyond its jurisdiction.[9]

---

between a finding of misconduct as related to the § 1326(d) affirmative defense and a finding of misconduct as it bears on whether the government's litigation position was in bad faith under the Hyde Amendment.

[9] We briefly address and reject two additional arguments. First, we have held "that independently sufficient alternative findings should be given preclusive effect" even where those findings "do not fulfill the necessity requirement . . . in a strict sense." *Jean Alexander Cosmetics*, 458 F.3d at 255. But comments made in the course of denying the Government's motion to dismiss cannot be viewed as alternative bases for the result here, which was a dismissal of the indictment. Second, although we have recognized that district courts have an "independent responsibilit[y]" to examine whether a Rule 48 motion to dismiss is "clearly contrary to manifest public interest," App. 1030–31 (quoting *In re Richards*, 213 F.3d 773, 787–88 (3d Cir. 2000)), we have never suggested that responsibility extends where the court has already granted a defendant's separate motion to dismiss on the merits, leaving it with no live controversy with respect to the government's motion.

For these reasons, we reject Reyes-Romero's argument that we are bound by findings or conclusions in the District Court's previous order.

### 2. Waiver

Of course, even if our review is not limited by issue preclusion or the law of the case, it "may well be constrained by other doctrines such as waiver [or] forfeiture." *Musacchio*, 136 S. Ct. at 716. Reyes-Romero seizes on those doctrines, arguing that the Government waived several arguments it advances on appeal by not pressing them before the District Court at the Hyde Amendment stage. We disagree.

Reyes-Romero identifies only two arguments he contends are waived: (i) that the delayed production of color copies of Reyes-Romero's immigration forms was a "snafu" attributable to Reyes-Romero's counsel's failure "to inspect the originals," Appellant's Br. 48; and (ii) that the District Court's finding that Officer Darji had lied under oath hinged on a "misread[ing]" of his testimony,[10] *id.* at 45. Reyes-Romero is correct in a limited sense: Those arguments do not appear in the Government's response to his Hyde Amendment application. And at least as a general matter, "[a]rguments not raised in the district courts are waived on appeal," *United States v. Tyler*, 956 F.3d 116, 124 n.9 (3d Cir. 2020), such that we cannot consider them

---

[10] Although Reyes-Romero's brief identifies a third argument—that Reyes-Romero "wanted to drop his claim for asylum," Appellee's Br. 13 (citing Appellant's Br. 53)—a review of the Government's brief reveals no such argument.

26

"absent exceptional circumstances," *United States v. James*, 955 F.3d 336, 345 (3d Cir. 2020) (citation omitted).

But our case law does not require parties to relitigate previously decided issues before the district court where doing so "would be an exercise in wasteful formality." *United States v. Hoffecker*, 530 F.3d 137, 165 (3d Cir. 2008) (citation omitted); *see Chassen v. Fidelity Nat'l Fin., Inc.*, 836 F.3d 291, 293 (3d Cir. 2016) ("[A] litigant [need not] engage in futile gestures merely to avoid a claim of waiver." (second alteration in original) (citation omitted)). Here, by the time the District Court had ruled on the parties' motions to dismiss and Reyes-Romero had applied for costs and fees, the Court's views on the prosecutor's conduct and the DHS officers' candor were beyond doubt, and relitigating them would have been nothing more than a "futile gesture[]," *Chassen*, 836 F.3d at 293. Faced with a court "more convinced than ever" on those points, App. 792, the Government's choice not to relitigate them was therefore reasonable and did not constitute waiver or forfeiture.

## B. Merits of the Hyde Amendment Application

Having dispensed with those threshold issues, we now turn to the merits of the Hyde Amendment award. For the reasons we explain below, we conclude that AUSA Hallowell, acting on behalf of the Government, satisfied the high ethical and professional standards to which we hold prosecutors, and the District Court mistakenly extrapolated from errors on the part of DHS to make findings about the prosecution that the record cannot support.

27

We start with two clarifications about the applicable legal framework and then explain why the Government's position was neither frivolous nor in bad faith.[11]

### 1. The applicable legal framework

The Hyde Amendment applies where, "in a[] criminal case[,] . . . the position of the United States was vexatious, frivolous, or in bad faith." 18 U.S.C. § 3006A app. The District Court examined a wealth of case law on the Amendment and accurately summarized much of the applicable legal framework. But we must clarify two aspects of that framework at the outset, one concerning "the position of the United States" and the other the requirement that that position be "vexatious, frivolous, or in bad faith."

---

[11] Although Reyes-Romero argued in the District Court that the Government's position was also vexatious, the Court found only frivolousness and bad faith, and Reyes-Romero has not specifically argued vexatiousness on appeal. To the extent that argument is implicit in his others, however, we reject it on the same grounds. Vexatiousness embodies two elements: (i) "that the criminal case was objectively deficient, in that it lacked either legal merit or factual foundation"; and (ii) "that the government's conduct, when viewed objectively, manifests maliciousness or an intent to harass or annoy." *Manzo*, 712 F.3d at 810 (citation omitted). The former roughly corresponds to frivolousness and the latter to bad faith, so our analysis here essentially covers all three grounds for a Hyde Amendment award.

28

### i. The meaning of "position of the United States"

Notwithstanding its reference to "the position of the United States," 18 U.S.C. § 3006A app., the Hyde Amendment is not a tool to combat misconduct by the federal government writ large. It applies only "in a[] criminal case," *id.*, which directs us to focus on "the government's position *underlying the prosecution*," *Manzo*, 712 F.3d at 810 (emphasis added) (quoting *Gilbert*, 198 F.3d at 1299). The Amendment thus reaches "prosecutorial misconduct" affecting the "case as an inclusive whole," *id.* (citations omitted), not misconduct in distinct government proceedings nor isolated "errors" by individual law enforcement officers in the course of the investigation or prosecution, *id.* at 813.

Our sister circuits share that view. The Second Circuit, for instance, reads "the position of the United States" for Hyde Amendment purposes "to mean . . . the government's general litigation stance: its reasons for bringing a prosecution, its characterization of the facts, and its legal arguments." *United States v. Bove*, 888 F.3d 606, 608 (2d Cir. 2018). The Ninth Circuit reads the Amendment as requiring an assessment of "the government's litigating position as a whole," not of "other types of bad conduct by government employees during the course of an investigation." *United States v. Mixon*, 930 F.3d 1107, 1111 (9th Cir. 2019); *see id.* at 1112 (requiring "serious misconduct *on the part of prosecutors*" (emphasis added)). Several others have agreed, *see, e.g.*, *Monson*, 636 F.3d at 439–40 (holding that a ruling for the defendant under *Franks v. Delaware*, 438 U.S. 154 (1978), which "constitutes a finding that law enforcement deliberately lied or recklessly disregarded the truth," "does not necessarily mean that . . . the prosecution

against the defendant was frivolous or vexatious"), and we are aware of no precedential appellate decision taking a different approach.

In sum: The Hyde Amendment demands we "[f]ocus[] on the *prosecutors*' conduct," *Monson*, 636 F.3d at 439 (emphasis added), and ask whether the alleged prosecutorial misconduct was so "pervasive" as to "render the government's litigating position *as a whole* vexatious, frivolous, or in bad faith," *Mixon*, 930 F.3d at 1112 (emphasis added).

The District Court, however, understood the "position of the United States," 18 U.S.C. § 3006A app., to include *both* "the litigation position of the DOJ through th[e] . . . U.S. Attorney's Office *and* the actions taken (or not taken) by" DHS officers, App. 26 (emphasis added), including as far back as Reyes-Romero's administrative removal proceeding in 2011. In assessing Reyes-Romero's Hyde Amendment application, for example, the Court found that DHS officers "railroaded [him] out of the country in 2011" in a manner that was "lacking in any reasonable factual or legal basis" and was therefore frivolous, App. 28–29, and that the officers' testimony in 2018 "demonstrate[d] clear bad faith" on their part, App. 29.

That understanding was mistaken. It assumes that, because the EAJA's "procedures and limitations" are incorporated into the Hyde Amendment, 18 U.S.C. § 3006A app., and because the EAJA defines "position of the United States" to include, "in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based," 28 U.S.C. § 2412(d)(2)(D), the Hyde Amendment must also incorporate that definition. But the EAJA's substantive definition of "position of the United

30

States" is neither a "procedure[]" nor a "limitation[]," so it cannot be read into the Hyde Amendment.

And there are good reasons not to compare EAJA apples to Hyde Amendment oranges. For one thing, we took a contrary view in *Manzo*, emphasizing "the government's position *underlying the prosecution*" and asking whether it was "objectively []reasonable for the government to attempt to prosecute" the defendant. 712 F.3d at 810, 813 (emphasis added) (citation omitted); *see also, e.g.*, *Mixon*, 930 F.3d at 1111 (defining "position of the United States" under the Hyde Amendment without reference to the EAJA definition); *Bove*, 888 F.3d at 608 & n.10 (noting that the phrase "position of the United States" "cannot mean precisely the same thing in both" the Hyde Amendment and the EAJA). For another, the EAJA covers a much broader swath of litigation, including civil actions arising from agency enforcement or adjudication. *See* 28 U.S.C. § 2412(a)(1); *see also Taylor v. Heckler*, 835 F.2d 1037, 1040 (3d Cir. 1987) (under the EAJA, the "position of the United States" necessarily includes "not only the litigation position . . . but also the agency position [that] made the lawsuit necessary" (alterations in original) (citation omitted)). Yet a criminal prosecution for unlawful reentry does not fit that paradigm: Although a previous removal order is "a necessary element to the [§ 1326] charge," App. 27, the criminal prosecution is distinct from and collateral to the immigration proceeding that led to the order and thus unlike agency enforcement actions that directly lead to civil actions in federal court. For these reasons,[12] we reaffirm the principles set out in *Manzo* and

---

[12] In interpreting the "position of the United States" to include actions of DHS and its officers, the District Court also

31

cited two out-of-circuit district court opinions—*United States v. Holland*, 34 F. Supp. 2d 346 (E.D. Va. 1999), and *United States v. Gardner*, 23 F. Supp. 2d 1283 (N.D. Okla. 1998)— both of which were decided before we or many of our sister circuits had a chance to construe the Amendment. In *Holland*, the court considered the defendants' application for costs and fees to flow not from the Hyde Amendment as bounded by the "procedures and limitations" of § 2412(d), but from a distinct open-ended EAJA provision holding the United States "liable for such fees and expenses to the same extent that any other party would be liable under the common law," 18 U.S.C. § 2412(b). *See* 34 F. Supp. 2d at 356–59. As the District Court recognized elsewhere in its opinion, *Holland*'s analysis deviates from the "consensus among circuits that the Hyde Amendment incorporates only those procedures and limitations in subpart (d)." App. 25. And although the *Holland* court originally found "vexatious misconduct" on the part of the Federal Deposit Insurance Corporation (FDIC) as well as DOJ, it later vacated that portion of its award after concluding the FDIC had lacked "sufficient notice that . . . fees and litigation expenses might be assessed against it." *United States v. Holland*, 48 F. Supp. 2d 571, 581 (E.D. Va. 1999). In *Gardner*, the district court ruled that the EAJA's broad definition of "position of the United States" is a "procedure or limitation incorporated into the Hyde Amendment" and therefore that executive agencies like the Internal Revenue Service can be swept into that definition. 23 F. Supp. 2d at 1293–95. But that analysis was not based on a rigorous analysis of the Amendment's statutory text, has never been cited favorably by any court of appeals, and is contrary to both *Manzo* and our conclusion today.

32

hold that the "position of the United States" for purposes of the Hyde Amendment refers only to the position taken by the department and officers charged with administering the prosecution—here, DOJ and AUSA Hallowell.

To be clear, misconduct by law enforcement officers or other executive departments can be *relevant* to a Hyde Amendment application if prosecutors leverage that misconduct to further a prosecution that has no factual or legal basis or that is brought for purposes of harassment. But because the Amendment is concerned only with prosecutorial misconduct, *see Mixon*, 930 F.3d at 1112 ("A defendant is not entitled to attorneys' fees under the Hyde Amendment due to law enforcement misconduct; rather, the focus is on the prosecutors . . . ."), alleged misconduct by DHS or its officers cannot independently create liability for attorney's fees and costs.

### ii. The meaning of "vexatious, frivolous, or in bad faith"

The Hyde Amendment applies where the Government's litigation position "was vexatious, frivolous, *or* in bad faith." 18 U.S.C. § 3006A app. (emphasis added). We have taken the Amendment's use of the disjunctive "or" to mean that each ground must be assessed separately, *see Manzo*, 712 F.3d at 810–11 (laying out different standards for each), and several of our sister circuits agree, *see, e.g.*, *Monson*, 636 F.3d at 438–39; *United States v. Manchester Farming P'ship*, 315 F.3d 1176, 1182 (9th Cir. 2003). While the three grounds meaningfully "overlap," *United States v. Terzakis*, 854 F.3d 951, 955, 956 n.3 (7th Cir. 2017), analyzing each on its own helps courts focus only on relevant factors and not on a nebulous sense of government impropriety.

33

When we conduct that analysis on this record and consider the Hyde Amendment case law on frivolousness and bad faith, we conclude Reyes-Romero is not entitled to an award.

### 2. The position of the United States was not frivolous

We and our sister circuits have laid extensive groundwork for analyzing frivolousness under the Hyde Amendment. For the Government's position to be frivolous, the prosecution it pursues must be "groundless[,] with little prospect of success." *Manzo*, 712 F.3d at 810 (alteration in original) (quoting *Gilbert*, 198 F.3d at 1299). Said differently, the position must be "foreclosed by binding precedent or . . . obviously wrong," *id.* at 811 (quoting *United States v. Capener*, 608 F.3d 392, 401 (9th Cir. 2010)), and a prosecution based on an unresolved but reasonable legal argument cannot be frivolous, *id. See Bove*, 888 F.3d at 608 (frivolousness requires a prosecution that is "[m]anifestly insufficient or futile" (alteration in original) (citation omitted)); *Monson*, 636 F.3d at 440 (to be frivolous, a prosecution must be "utterly without foundation in law or fact" (citation omitted)). In assessing frivolousness, therefore, we view the prosecution through the lens of the elements of the criminal charge and the evidence required to satisfy those elements.

We also find guidance in Hyde Amendment case law addressing vexatiousness, which—though a distinct ground for awarding fees, *see supra* note 11—overlaps with frivolousness to the extent it too requires that the prosecution be "objectively deficient, [meaning] lack[ing] [in] either legal merit or factual foundation." *Manzo*, 712 F.3d at 810. In *Manzo*, for instance, the defendant argued the government had made "blatantly

false" allegations about his receipt of a cash bribe. *Id.* at 812. In that decision, we assumed he had not received the cash and that the government had knowingly presented false testimony. *See id.* Even so, we explained, the charges against the defendant "did not require the government to prove that he physically received a cash bribe," and because the government could "plausibly argue that Manzo was aware of the cash payment . . . and played a role in facilitating it," it maintained a viable—and thus objectively nonfrivolous—pathway to conviction. *See id.*

*Manzo* controls here. Reyes-Romero did not contest either element required for conviction under § 1326(a)—that he was removed and later found in the country without the Attorney General's consent. Rather, he sought to attack the removal order collaterally under § 1326(d), which we have treated as akin to an affirmative defense. *See Richardson v. United States*, 558 F.3d 216, 222 (3d Cir. 2009); *United States v. Charleswell*, 456 F.3d 347, 358 (3d Cir. 2006). Yet at every point in the prosecution, from the return of the indictment through the decision resolving the parties' motions to dismiss, the Government had—at minimum—a reasonable argument that Reyes-Romero could not show prejudice under § 1326(d)(3) and thus could not make out the affirmative defense. The District Court even recognized as much, characterizing the Government's position on prejudice as "largely reasonable and based in law." App. 42.

We agree with the characterization of the Government's prejudice arguments as reasonable and based in law, and we briefly highlight some of the complexities on which those arguments turned. The first was whether Reyes-Romero's

conviction qualified as a "crime of violence," 8 U.S.C. § 1101(a)(43)(F) (incorporating 18 U.S.C. § 16's definition), and thus an aggravated felony rendering him ineligible for asylum, *id.* § 1158(b)(2)(A)(ii), (B)(i), and cancellation of removal, *id.* § 1229b(a)(3). Although § 16(b)'s residual clause has been held void for vagueness, *Sessions v. Dimaya*, 138 S. Ct. 1204, 1210 (2018); *Baptiste v. Att'y Gen.*, 841 F.3d 601, 615–21 (3d Cir. 2016), those decisions were not in place in 2011, and the Government argued prejudice must be assessed as of the underlying removal proceedings rather than as of the collateral challenge to those proceedings. Even setting § 16(b) aside, Reyes-Romero would remain ineligible for asylum and cancellation if his offense fit within § 16(a)'s elements clause, which in turn depended on whether an offense capable of commission through reckless conduct can satisfy that clause—a difficult and open question the Supreme Court recently agreed to resolve, *see supra* note 3. A related question was whether Reyes-Romero's offense qualified as a "particularly serious crime" rendering him ineligible for withholding of removal, 8 U.S.C. § 1231(b)(3)(B)(ii). At the time of his removal, our precedent held "that an offense must be an aggravated felony in order to be classified as a 'particularly serious crime.'" *Alaka v. Att'y Gen.*, 456 F.3d 88, 105 (3d Cir. 2006). But we have since revisited *Alaka*, holding that "the phrase 'particularly serious crime' . . . includes but is not limited to aggravated felonies." *Bastardo-Vale v. Att'y Gen.*, 934 F.3d 255, 266–67 (3d Cir. 2019) (en banc). And the notion that second-degree aggravated assault under New Jersey law could have qualified as particularly serious was not out of the question. *See, e.g.*, *Aguilar v. Att'y Gen.*, 665 F. App'x 184, 185–86, 188–89 (3d

Cir. 2016) (per curiam) (upholding the BIA's designation of that offense as particularly serious).[13]

We need not review every step in the District Court's analysis. It is enough to say we agree that whatever the merits of Reyes-Romero's arguments on prejudice, the Government's arguments in response were "reasonable and based in law," App. 42—or, put another way, were far from "foreclosed by binding precedent or . . . obviously wrong," *Manzo*, 712 F.3d at 811 (citation omitted). As a result, the Government at all times maintained a viable path to conviction, making its litigation position nonfrivolous under the Hyde Amendment.

Reyes-Romero argues to the contrary, urging us to accept the District Court's reasoning. We address each argument below.

---

[13] There is also the matter of Reyes-Romero's evidence showing fear of persecution or torture if returned to El Salvador. The District Court concluded Reyes-Romero had shown a reasonable likelihood of obtaining relief from removal, but it did so only after an extensive review of the evidence and the case law, and only after reaching favorable conclusions on close issues such as the cognizability of Reyes-Romero's family unit as a particular social group, the relevance of incidents that took place in Honduras, and whether the private violence he feared would qualify as torture for CAT protection. That both the IJ and BIA in Reyes-Romero's subsequent removal proceeding rejected his applications for relief from removal, *see supra* note 6, further suggests the Government's arguments were not beyond the pale.

37

We start with language from Reyes-Romero's indictment stating that he had been "removed from the United States *pursuant to law*." App. 31 (quoting App. 63). Reyes-Romero seizes on that language, arguing that if a removal proceeding violated DHS's rules or a noncitizen's rights, the noncitizen was not removed "pursuant to law" and thus cannot be prosecuted for unlawful reentry regardless whether he can show that those errors caused him prejudice. But that argument runs aground on our precedent, which holds that "prejudice is a necessary component under [§] 1326(d)(3)." *Charleswell*, 456 F.3d at 358. In plain terms, a criminal defendant who concedes the elements of § 1326(a) but cannot satisfy § 1326(d)(3)'s prejudice requirement—which, we have held, generally requires a showing of "a reasonable likelihood that the result would have been different if the error in the [removal] proceeding had not occurred," *id.* at 362 (citation omitted)—is guilty of unlawful reentry, and the Government's prosecution of that charge cannot be "groundless," *Manzo*, 712 F.3d at 810 (citation omitted).

Reyes-Romero's argument to the contrary is essentially that when a defendant has a good case on some but not all the elements of an affirmative defense, the Government must concede the rest and consent to dismissal on his terms. That simply is not the law. Although our criminal justice system depends on prosecutors' discretion to decide which cases to pursue, their choice to pursue an objectively valid prosecution is immune from scrutiny by the federal courts. Put another way, our "constitutional framework" is such that "we cannot read the Hyde Amendment to license judicial second-guessing of prosecutions that are objectively reasonable," *United*

*States v. Shaygan*, 652 F.3d 1297, 1314 (11th Cir. 2011)—as this prosecution undoubtedly was.

Nor was the Government bound to abandon the prosecution because it shined a light on an administrative removal proceeding that, as the Government acknowledges, was something of a "botched job." Arg. Tr. 15. To the contrary, "[i]t is the responsibility of the Department of Justice to enforce the law vigorously[,] and it cannot abdicate this duty because of possible embarrassment to other agencies of the government." U.S. Dep't of Justice, Justice Manual § 9-2.159 (2018), https://www.justice.gov/jm/justice-manual. Despite signs that DHS might have mishandled Reyes-Romero's administrative removal, AUSA Hallowell nonetheless maintained a nonfrivolous pathway to conviction throughout the prosecution, and under those circumstances we cannot fault him or the office he represents for continuing to seek such a conviction.

As a last resort, Reyes-Romero suggests we deem the prosecution frivolous because prejudice must be "presume[d]." Arg. Tr. 31–32. He relies for this proposition on *Charleswell*, where we stated that "some procedural defects may be so central or core to a proceeding's legitimacy, . . . and the difficulty of proving prejudice so great[,] that prejudice may be presumed." 456 F.3d at 362 n.17 (internal quotation marks and citation omitted).

That language, however, is dicta in a footnote. We have never given effect to the possibility we left open in *Charleswell*, nor (to our knowledge) has any other court of appeals. Nor need we address that possibility today; the point, rather, is that where no appellate court has so held to date, we cannot say the Government lacked a "reasonable legal basis"

39

for contending § 1326(d)(3)'s prejudice prong could not be satisfied. *Manzo*, 712 F.3d at 811 (citation omitted); *see id.* ("The government should be allowed to base a prosecution on a novel argument, so long as it is a reasonable one, without fear that it might be setting itself up for liability under the Hyde Amendment." (citation omitted)). It would also be especially perverse to fault the Government for ignoring this possibility here given that Reyes-Romero—who carries the burden on each of § 1326(d)'s elements—failed to mention it until his supplemental reply brief filed months after his initial § 1326(d) motion.

In sum, the Government at all times had a legally defensible and factually supported basis for prosecuting Reyes-Romero for unlawful reentry. The "position of the United States," 18 U.S.C. § 3006A app., therefore, was not frivolous.[14]

---

[14] In analyzing a Hyde Amendment application, the district court's task is to "make only one finding . . . based on the case as an inclusive whole" rather than engaging in "[a] count-by-count analysis." *Manzo*, 712 F.3d at 810 (citation omitted). Here, that task is straightforward because Reyes-Romero was charged with only one offense. We therefore have no occasion to address the implications of a multicount prosecution where only one or some counts are viable. *Cf. United States v. Heavrin*, 330 F.3d 723, 730 (6th Cir. 2003) (noting that a Hyde Amendment award may be appropriate "[e]ven if the district court determines that part of the government's case has merit" so long as "the government's 'position' as a whole was vexatious, frivolous, or in bad faith").

### 3. The position of the United States was not in bad faith

Nor did the Government initiate or prolong Reyes-Romero's criminal prosecution in bad faith.

On this issue, too, we benefit from a well-developed line of precedent. Bad faith requires more than "bad judgment or negligence"; it demands "the conscious doing of a wrong because of dishonest purpose or moral obliquity." *Manzo*, 712 F.3d at 811. And in assessing whether the "position of the United States was . . . in bad faith," 18 U.S.C. § 3006A app., we may not "delve into the minds and motivations of individual prosecutors," *Manzo*, 712 F.3d at 813. Instead, we must "engage in an objective inquiry," *Manzo*, 712 F.3d at 811 (citing *Shaygan*, 652 F.3d at 1313–14), asking whether "[u]nder th[e] circumstances" the government's litigation strategy was "objectively unreasonable" in light of the facts and "binding case law." *Id.* at 813. And in doing so, we must be wary to leave prosecutors the breathing space necessary to pursue justice with vigor. A Hyde Amendment award is not available simply because a defendant was acquitted or because the government engaged in "contentious and hard-fought" litigation tactics. *United States v. Schneider*, 395 F.3d 78, 88 (2d Cir. 2005). To the contrary, "government attorneys are entitled to be zealous advocates of the law on behalf of the . . . people of the United States," and "[w]hile a prosecutor is not at liberty to strike foul blows, he may strike hard ones . . . —indeed, he should." *United States v. Knott*, 256 F.3d 20, 29 (1st Cir. 2001) (internal quotation marks and citation omitted).

The District Court identified seven points throughout the prosecution that in its view constituted "evidence of bad faith,"

41

App. 36, on the part of AUSA Hallowell and, by extension, DOJ. We address them one by one. Although we generally owe deference to factual findings, any finding that "is implausible based on the record" is clearly erroneous and thus "unsustainable." *Capener*, 608 F.3d at 403; *see United States v. Heavrin*, 330 F.3d 723, 727 (6th Cir. 2003) (reversal of a Hyde Amendment award is required where the reviewing court is left with "a definite and firm conviction" that "a mistake has been made" (citation omitted)).

### i.   Obtaining the indictment

First, we disagree that the Government relied on "facially invalid waivers," App. 31, to seek an indictment and proceed with the prosecution against Reyes-Romero. Even if we were to accept that the Government was "mistaken at the time of [the] [i]ndictment," App. 31, "the Hyde Amendment [is] targeted at prosecutorial misconduct, not prosecutorial mistake," *Capener*, 608 F.3d at 401 (alteration in original) (citation omitted). And here, the contents of Reyes-Romero's A-file gave the Government probable cause to believe that he fell within the facial elements of the § 1326(a) offense. Although a defendant in Reyes-Romero's position may bring a collateral challenge under § 1326(d), that challenge is akin to an affirmative defense, and it is up to the defendant to assert and prove it. That defense does not turn on whether the removal was "pursuant to law," App. 31; it requires (among other things) prejudice, *Charleswell*, 456 F.3d at 358, and there was nothing in the A-file to suggest Reyes-Romero could show a reasonable likelihood of any outcome other than removal. When viewed objectively, therefore, the decision to indict and prosecute Reyes-Romero does not give rise to an inference of bad faith.

42

### ii. The DHS officers' testimony

Nor are we persuaded that Officers Darji and Alicea gave false testimony or that the Government's refusal to label it as such violated its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959).

We start with the most frequently quoted portion of the testimony: Officer Darji's acknowledgment that the forms in Reyes-Romero's A-file did not "make any sense." App. 331. It is not the case that Officer Darji "admitted on the stand that *his testimony* (given just moments before) was, in fact, nonsense." App. 32 (emphasis added). Officer Darji had no specific memory of Reyes-Romero's proceeding, and thus offered testimony only about the "normal practice" in his DHS unit, App. 319. In the leadup to Officer Darji's oft-quoted admission, the District Court took over questioning and presented him with the irregularities in Reyes-Romero's forms, asking whether it was "reading those forms correctly." App. 331. The Court then asked whether "that"—the antecedent of which was the content of "those forms"—"ma[de] any sense," and Darji admitted it did not. *Id.*

In context, Officer Darji's comment was a candid admission that he could not explain away the apparent problems with Reyes-Romero's removal proceeding. And, at least initially, the District Court agreed, summarizing that Officer Darji had admitted that "the process that was used here" did not "ma[ke] . . . sense." App. 476. The quite different notion that Darji admitted that he had lied in his testimony, however, "is a kind of [factual] Lohengrin," in that we do not "know whence it came," *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir.

43

1975).  Because that notion finds no support in the record, we reject it.

As a result, nothing in Officer Darji's concession triggered *Napue* obligations on the part of AUSA Hallowell.  Those obligations spring to life only when the prosecutor "knows that his witness is giving testimony that is substantially misleading" and where the misleading nature of the testimony is "obvious." *United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir. 1974).  A candid admission of the kind Officer Darji gave does not fit those criteria.

Nor do the remaining portions of the DHS officers' testimony.  To be sure, both officers, testifying years later and with no specific memory of Reyes-Romero's removal proceeding, gave testimony that was at times equivocal, confusing, or inconsistent.  Officer Darji, for instance, changed an answer he gave about whether a prior signature was required to authorize service of the I-851 on noncitizens.  For his part, Officer Alicea gave difficult-to-reconcile answers in response to questions about when in the process the I-851's contents would be read to the noncitizen in Spanish.  But to the extent the officers' testimony was somewhat "convoluted," App. 43 (citation omitted), it reflects at least in part the byzantine nature of the administrative removal system and in part the circumstances of their questioning.  Given that the District Court assumed the questioning and raised a line of inquiry about the time stamps on the I-851 that Reyes-Romero had not flagged and for which the Government and its witnesses likely had not prepared, it is unsurprising the officers were in some respects ill equipped to explain the contents of Reyes-Romero's A-file.  In short, while we recognize certain weaknesses in the officers' testimony, we

44

discern no basis in the record to conclude that the officers were deliberately perjuring themselves. At most, they exhibited the kind of inconsistency that is the normal stuff of cross-examination and that might lead a trier of fact to discount their testimony—but not to assume the sort of deliberate dishonesty that would require a prosecutor to correct the record. In our judgment, that distinction is critical here not only because of the effect on AUSA Hallowell's obligations but also because of the severe reputational, professional, and legal consequences that could flow from a finding that Officers Darji and Alicea deliberately lied under oath. That finding was unjustified here.

At bottom, the *Napue* argument comes to this: that because the District Court ultimately decided not to credit the officers' testimony, the Government must have been obligated to disclaim it mid-trial. That does not follow. In presenting the testimony of government witnesses, a prosecutor need not "play the role of defense counsel . . . and ferret out ambiguities in his witness' responses on cross-examination." *Harris*, 498 F.2d at 1169. He also cannot supplant the role of the finder of fact in assigning weight to testimony as he deems appropriate. We therefore discern no violation of AUSA Hallowell's *Napue* obligations and no basis here to infer bad faith.

### iii. Litigating exhaustion and judicial review

We next confront the idea that the Government exhibited bad faith by continuing to litigate exhaustion and judicial review even after the extent of the irregularities in Reyes-Romero's A-file came to light. A review of the record reveals the opposite: that AUSA Hallowell promptly and appropriately abandoned all arguments on § 1326(d)(1) and (2).

45

The initial two-day hearing on Reyes-Romero's § 1326(d) motion took place in early January 2018. During the second day, the District Court informed the parties it was "highly likely" to rule in Reyes-Romero's favor on exhaustion and judicial review. App. 474–75. That left prejudice as "the only open issue," App. 543, on which the District Court requested additional briefing. The parties twice requested more time to submit a schedule for that briefing and did not settle on such a schedule until late January. A month later—and before its supplemental brief was due—the Government moved to dismiss under Rule 48. No doubt the Government expected its motion would be the end of the case. But after the District Court continued to press the Government on the merits of the § 1326(d) motion, it promptly filed a brief in mid-March making its position clear: It would "not rely on or adopt th[e officers'] testimony" and, if pushed to litigate the § 1326(d) motion, "w[ould] not present argument on any elements . . . other than the issue of prejudice." App. 755. And it reinforced that position at the next hearing.

AUSA Hallowell's response was prompt, unambiguous, and consistent with the best traditions and standards of his office. That it occurred "over two months" after the initial hearing, App. 32, was a product of the parties' agreed briefing schedule, the Court's unexpected reservations about the Government's motion to dismiss, and its ongoing inquiry into the effect of a dismissal on future immigration proceedings. The Government was still "act[ing] promptly to correct [any] error," *United States v. Lain*, 640 F.3d 1134, 1139 (10th Cir. 2011), and its response is inconsistent with a finding of bad faith.

46

### iv. Interactions between DOJ and DHS

We likewise see no signs of bad faith in AUSA Hallowell's inability to tell the District Court whether, if the prosecution were dismissed, DHS would detain Reyes-Romero or seek reinstatement of the 2011 removal order. In asserting that he could not "speak for DHS . . . or what [it] would do" in future immigration proceedings against Reyes-Romero, App. 617, AUSA Hallowell was faithfully representing our precedent to the District Court. *See United States v. Igbonwa*, 120 F.3d 437, 443–44 (3d Cir. 1997) (holding that an AUSA cannot bind DHS in future immigration proceedings absent DHS's consent). Had the Court granted the Government's motion to dismiss, any relevance of the 2011 order would have been left to DHS in the first instance (in deciding whether to pursue a new NTA or seek reinstatement) and, if necessary, to other administrative adjudicators and a different Article III court.

To be sure, it is possible for an AUSA, after having obtained "prior authorization from [DHS]," Justice Manual, *supra*, § 9-73.510, to come to a binding agreement with respect to future immigration proceedings against a noncitizen defendant. But an AUSA lacks the power to do so on his own. More important, whether and under what circumstances he reaches out to DHS to explore such an arrangement is committed to his discretion—he is not bound to do so. And even if he *does* seek authorization from DHS, he cannot demand that the agency give it, and if the agency declines the AUSA cannot be held responsible. When viewed through an objective lens, therefore, the absence of such an arrangement between DOJ and DHS with respect to future proceedings against Reyes-Romero also does not support an inference of bad faith.

Two related issues must be addressed. First, we do not consider significant that DHS and DOJ were to some extent "intertwin[ed] . . . in this case," App. 37 (emphasis omitted), insofar as DOJ and DHS kept in contact about Reyes-Romero or a line-level DHS official was present at counsel table for all but one of the hearings before the District Court. Coordination between DOJ and other executive departments is by no means unusual, but it does not obviate the line between those departments or between a criminal prosecution and subsequent administrative proceedings. We therefore see no support for the notion that the Government here attempted to use its collaboration with DHS as both a sword and a shield against Reyes-Romero.

Second, we are equally unpersuaded that the AUSA exhibited bad faith by focusing on the criminal offense with which Reyes-Romero was charged, the evidence necessary to prove that offense, and the elements of Reyes-Romero's affirmative defense. Those were, after all, the only live issues over which the District Court had jurisdiction. Even so, AUSA Hallowell did his best to assist the Court in its consideration of matters well beyond that jurisdiction, most notably the effect that various dispositions might have on future immigration proceedings against Reyes-Romero. The AUSA's responsiveness, candor, and professionalism in answering unanticipated questions bespeak good faith on his part and in the "position of the United States," 18 U.S.C. § 3006A app. And in general, the AUSA offered candid and accurate assistance to the tribunal; was forthright about the weaknesses in the case; and, once he had received additional evidence bolstering Reyes-Romero's arguments on prejudice and once the prosecution had exhausted more time and resources than was expected, sensibly

reevaluated it and decided dismissal was in the best interests of justice. There is much to commend in the way the prosecution litigated this case, and certainly nothing of the "dishonest purpose or moral obliquity," *Manzo*, 712 F.3d at 811 (citation omitted), required to justify a Hyde Amendment award.

### v. The Government's motion to dismiss

We now come to a central premise of the Hyde Amendment award: that the Government's motion to dismiss was motivated by, and evidence of, bad faith.

There is good reason for skepticism: It is ironic indeed that the government's decision to move to dismiss a criminal case with prejudice would be held up as proof of ill will toward the defendant. Normally, if circumstances arise making it clear that the Government's case is weaker than it once appeared and the "Government act[s] promptly to correct [that] error," a court will be hard pressed to find bad faith. *Lain*, 640 F.3d at 1139. The District Court recognized this dynamic, correctly stating that if an AUSA "conclude[s] that a criminal prosecution should not proceed" and moves to dismiss, that is an appropriate exercise of prosecutorial discretion and precisely "how we want the system to work." App. 635. But it proceeded to find that motion was evidence of bad faith on two grounds.

The first was that the motion was designed "to shield the 2011 Removal Order from an adjudication of invalidity" and thereby interfere with future immigration proceedings against Reyes-Romero. App. 36. In other words, because the Government agreed the prosecution should be dismissed, it had no

49

non-malicious reason for refusing "to not oppose the bare granting of Reyes-Romero's motion to dismiss." App. 4.

Implicit in that analysis is that there is no meaningful difference between (i) exercising discretion to dismiss the prosecution because of some "litigation risk" on the prejudice prong, App. 646, and (ii) conceding outright that Reyes-Romero has satisfied the prejudice prong. Not so. A prosecutor may have probable cause to believe an element of an affirmative defense is triable but still conclude that, because of the closeness of the question as well as other considerations such as expenses and the time a defendant has already been in custody, the interests of justice would not be well served by continuing to pursue the prosecution. That is, indeed, how the system should work. And, most critical, the Government must be free to do so without having to concede away the merits of the criminal charge or any affirmative defenses, which would have been the effect of endorsing Reyes-Romero's § 1326(d) motion.

Nor can we agree that the Government was "[n]ever asked . . . to stipulate to 'prejudice'" and could have opted to "'not oppose' the granting of Reyes-Romero's motion." App. 15–16. Because dismissal under § 1326(d) requires prejudice, *see* 8 U.S.C. § 1326(d)(3); *Charleswell*, 456 F.3d at 358, the Government cannot agree to a § 1326(d) dismissal without acknowledging that the prejudice requirement has been met. And given the closeness of the prejudice question, *see supra* pp. 35–37 & n.13, it strikes us as objectively reasonable that the Government elected not to do so.

The second ground for the finding that the Government moved to dismiss in bad faith was that the reasons it offered in support of its motion were pretextual. After a review of the

record, we conclude the Government's reasons were sensible and consistent. It explained, for instance, that its motion to dismiss was motivated in part by a desire to preserve litigation resources. That is no surprise given that the single-count prosecution had already lasted months and generated many hearings and briefs. True, the Government "then expended substantial resources on continuing to oppose Reyes-Romero's motion to dismiss" while its own motion remained pending. App. 39. But that was only because the Government's motion was held open, requiring that it continue to litigate the merits of Reyes-Romero's § 1326(d) defense. The Government's explanation can be viewed as contradictory only if we assume there was no difference between acceding to Reyes-Romero's motion and proceeding on the Government's motion—an idea we have already rejected.

### vi. Production of the color copies

Next, we see no evidence to support the idea that the late-in-the-game production of color copies from Reyes-Romero's A-file suggests bad faith on the Government's part. Under the line of cases springing from *Brady v. Maryland*, 373 U.S. 83 (1963), prosecutors have an affirmative duty to disclose material evidence favorable to the defendant. *Dennis v. Sec'y*, 834 F.3d 263, 284 (3d Cir. 2016) (en banc). But there is no question that AUSA Hallowell, after having received the color copies, promptly shared them with Reyes-Romero's counsel and with the District Court. That he did so was consistent with his *Brady* obligations as well as good faith in the management of the prosecution.

Nor is there anything to suggest the Government exhibited bad faith by producing the color copies months into the

51

prosecution rather than at the outset. To begin, our precedent on the timing of *Brady* disclosures requires only that the government "make[] [the] evidence available during the course of a trial in such a way that a defendant is able effectively to use it." *United States v. Moreno*, 727 F.3d 255, 262 (3d Cir. 2013) (citation omitted). Reyes-Romero was certainly able to use the color copies of the forms to his benefit; those copies fed into the District Court's decision granting his § 1326(d) motion. More to the point, there was no reason why AUSA Hallowell— or, for that matter, Reyes-Romero's counsel, who was given an opportunity to access or request the original files—could have anticipated that the color copies would contain meaningful, relevant evidence that the black-and-white reproductions did not. Under those circumstances, AUSA Hallowell lacked "actual or constructive possession" of the information contained in the color copies, *Hollman v. Wilson*, 158 F.3d 177, 180 (3d Cir. 1998), and accordingly that he did not request or produce them earlier in the litigation does not give rise to an inference of bad faith.

We end by addressing the assertion that the production of black-and-white copies was "a clear implication of conscious wrongdoing," App. 40, on the part of unnamed DHS officials. Because the Hyde Amendment is concerned only with prosecutorial misconduct, even such unscrupulous conduct by an independent executive department could not be laid at the prosecution's feet without a reasonable and logical basis for doing so. Moreover, a review of the record here reveals nothing apart from speculation suggesting that DHS's production of black-and-white copies was intended to shield Reyes-Romero's A-file from scrutiny—rather than, for instance, being the

52

product of an outdated photocopier or cost-saving printing procedures. So thin a reed cannot justify a Hyde Amendment award.

### vii. Litigation delay

Finally, we disagree that the criminal proceeding was "unnecessarily drawn out by the various litigation tactics taken by the Government." App. 43. The time between Reyes-Romero's motion to dismiss and the decision granting that motion was roughly seven and a half months. If that period is longer than in the typical § 1326 prosecution, the reasons are many, including the ongoing evolution of Reyes-Romero's arguments on prejudice, mutual delays in the briefing schedule, complicated legal and factual questions and, above all, a willingness on the part of the District Court to hold outstanding motions open and solicit supplemental briefing. Those reasons for delay are unexceptional and understandable. But unwarranted delay on the part of the Government was not one of them.

\*     \*     \*

Ultimately, with great respect for the District Court and its careful administration of this prosecution, we nonetheless conclude based on our review of the record that "a mistake has been made." *Heavrin*, 330 F.3d at 727 (citation omitted). There is no viable evidence that the "position of the United States," as that term is properly understood in the Hyde Amendment, was frivolous or in bad faith.

We share the District Court's view that Reyes-Romero's 2011 expedited removal proceeding deviated from the ordered, sensible process we demand of those who enforce the nation's

immigration laws. Indeed, that is the Government's view as well. And reasonable minds may differ about precisely how the prosecution should have reacted once those issues became apparent. But where reasonable minds may differ, and where the Government made objectively reasonable and defensible choices throughout the prosecution, there can be no Hyde Amendment liability.

## IV. CONCLUSION

For these reasons, we will reverse the District Court's orders awarding Reyes-Romero attorney's fees and costs under the Hyde Amendment.